UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JABBAR FAZELI, MD & MAINE GERIATRICS, LLC,<br><br>    Plaintiffs,<br><br>      v.<br><br>NORTHBRIDGE STROUDWATER  LODGE II, LLC; NORTHBRIDGE STROUDWATER ASSISTED LIVING, LLC d/b/a STROUDWATER LODGE; NORTHBRIDGE AVITA STROUDWATER II, LLC; AVITA STROUDWATER LLC d/b/a AVITA OF STROUDWATER; NORTHBRIDGE AVITA WELLS II, LLC; AVITA WELLS, LLC d/b/a AVITA OF WELLS; NORTHBRIDGE COMPANIES; KATRIN FEICK, & ORLENE DEMATTEO<br><br>    Defendants. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiffs, Jabbar Fazeli, MD ("Fazeli") and Maine Geriatrics, LLC

("Maine Geriatrics") by and through undersigned counsel, and complains against the Defendants,

Northbridge Stroudwater Assisted Living II, LLC; Northbridge Stroudwater Assisted Living, LLC

("Stroudwater Lodge"), Northbridge Avita Stroudwater II, LLC; Avita Stroudwater LLC ("Avita of

Stroudwater"), Northbridge Avita Wells II, LLC; Avita Wells, LLC ("Avita of Wells"),

Northbridge Companies; Katrin Feick, and Orlene Dematteo  as follows:

## JURISDICTION AND PARTIES

1.        This action arises under 42 U.S.C. § 1981 ("§ 1981") and the Whistleblowers'

Protection Act ("WPA"), 26 M.R.S. §§831 *et seq.*, as enforced through the Maine Human Rights

Act ("MHRA"), 5 M.R.S. § 4551 *et seq.*

2.        This action also includes common law claims for  breach of contract, defamation,

and tortious interference.

3.        Dr. Fazeli is a United States citizen residing in Kittery Point, County of York, State

of Maine.

4.        Maine Geriatrics, LLC ("Maine Geriatrics") is a Maine limited liability

corporation.

5.        Dr. Fazeli is Maine Geriatrics' sole member.

6.        Avita of Stroudwater, Stroudwater Lodge, Avita of Wells, and Northbridge

Companies are all Delaware corporations.

7.        At the times that Plaintiffs provided services and care at Stroudwater Lodge, the

corporate entity for Stroudwater Lodge was Northbridge Stroudwater Assisted Living, LLC.

8.        In January 2020, Northbridge Stroudwater Assisted Living, LLC was cancelled

and on information and belief Northbridge Stroudwater Lodge II, LLC is the successor in interest

to Northbridge Stroudwater Assisted Living, LLC and is jointly liable for any judgment in this

matter.

9.        At the times that Plaintiffs provided services and care at Avita of Stroudwater, the

corporate entity for Avita of Stroudwater was Avita Stroudwater, LLC.

10.     In January 2020, Avita Stroudwater, LLC was cancelled and on information and belief Northbridge Avita Stroudwater II, LLC is the successor in interest to Avita Stroudwater, LLC and is jointly liable for any judgment in this matter.

11.     At the times that Plaintiffs provided services and care at Avita of Wells the corporate entity for Avita of Wells was Avita Wells, LLC.

12.     In January 2020, Avita Wells, LLC was cancelled and on information and belief Northbridge Avita Wells II, LLC is the successor in interest to Northbridge Avita Wells, LLC and is jointly liable for any judgment in this matter.

13.     Katrin Feick, and Orlene DeMatteo reside in Maine.

14.     At all times relevant to this case Avita of Stroudwater, Stroudwater Lodge, Avita of Wells, and Northbridge Companies had more than fifteen employees.

15.     The amount in controversy in this matter exceeds $75,000.

16.     This Court has subject matter jurisdiction over Plaintiffs' federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

17.     The operative facts in this case occurred in Maine, primarily in York and Cumberland counties.

18.     Plaintiffs filed a timely Charge of Discrimination with the Maine Human Rights Commission ("MHRC").  Plaintiffs subsequently amended their Charge.

19.     On August 27, 2020, the MHRC issued right to sue letters with regard to Plaintiffs' claims.

20.     Plaintiffs have exhausted their administrative remedies with respect to all claims requiring administrative exhaustion set forth in this Complaint.

<u>JURY TRIAL REQUESTED</u>

21.     Plaintiffs request a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

22.     Under the WPA, the word "person" means an individual, sole proprietorship, partnership, corporation, association or any other legal entity. 26 M.R.S. §832(3).

23.     The WPA protects "employees" from retaliation, and defines "employee" as follows:

> "Employee" means a person who performs a service for wages or other remuneration under a contract of hire, written or oral, expressed or implied, but does not include an independent contractor engaged in lobster fishing. "Employee" includes school personnel and a person employed by the State or a political subdivision of the State. 26 M.R.S. §832(1).

24.     The plain language of the WPA includes independent contractors within the definition of employees. *Allstate Ins. Co. v. Chretien*, Civil No. 1:12-CV-38-DBH, 2013 WL 6531751, at *22, 2013 U.S. Dist. LEXIS 175458 (D. Me., Nov. 5, 2013) (Recommended Decision), *affirmed and adopted by*, 2013 WL 6531751, 2013 U.S. Dist. LEXIS 175457 (D. Me., Dec. 12, 2013) (Hornby, J.).

25.     Dr. Fazeli and Maine Geriatrics were "employees" of Defendants Stroudwater Lodge, Avita of Stroudwater, Avita of Wells, and Northbridge Companies as defined by the WPA as persons who perform a service for wages or other remuneration under a contract of hire, written or oral, expressed or implied. 26 M.R.S. §832(1).

26.     Stroudwater Lodge, Avita of Stroudwater, Avita of Wells, and Northbridge Companies were  "employers" as defined by the WPA, meaning, a person who has one or more employees. 26 M.R.S. §832(2).

27.     Defendant Northbridge Companies operates assisted living facilities in New York, New Hampshire, Massachusetts, and Maine, including Westbrook and Wells, Maine.

28.     At all times material to this Complaint, Northbridge Companies was an integrated enterprise with Stroudwater Lodge, Avita of Stroudwater, Avita of Wells, namely Northbridge had shared ownership, shared management, integrated operations, and centralized control of labor relations.

29.     Avita of Stroudwater is a 60-unit assisted living and memory care community. At times material to this Complaint Katrin Feick was the facility's Executive Director and Orlene DeMatteo was the Resident Care Director ("RCD").

30.     Stroudwater Lodge is a 95-unit independent and assisted living community. At times material to this Complaint, Courtney Freeman was the facility's Senior Executive Director and Tracy Hoppe was the RCD.

31.     Dr. Fazeli is a Muslim Arab and was born in Iran.

32.     Dr. Fazeli was the on-site physician at Avita of Stroudwater starting in 2013.

33.     On March 1, 2015, Maine Geriatrics and Dr. Fazeli entered into a medical services contract with Avita of Stroudwater, and Dr. Fazeli became the Medical Director for the facility.

34.     Plaintiffs entered into medical services contracts with two more facilities, Avita of Wells and Stroudwater Lodge, commencing on April 25, 2016.

35.     Courtney Freeman, Senior Executive Director at The Northbridge Companies signed all three medical services contracts on behalf of Defendants.

36.     As Medical Director, Dr. Fazeli conducted weekly rounds at the three facilities, consulted on dementia patients with behavioral disturbances, conducted team building and staff

education on dementia care, taught best practices, consulted on polypharmacy, advocated for reduced misuse of antipsychotic medications, consulted with the Executive Directors about complex cases, and was involved in strategic planning, community education and marketing.

37.     Maine Geriatrics provided onsite visits by Nurse Practitioners ("NPs") at least once per week and coordination of care.  Dr. Fazeli and his staff provided 24/7 medical coverage for the three facilities.

38.     At all times, Defendants were aware of the manner in which Dr. Fazeli and his staff provided coverage and care and indicated that this model was acceptable for the many years that the contracts were in place.

39.     Residents of the facilities had free choice of medical providers.

40.     As of November 2018, Dr. Fazeli had been chosen as the personal physician for about 80% of residents.

41.     Between 2013 and 2018, leadership changed several times at Avita of Stroudwater.  There were three Executive Directors during that time frame and multiple RCDs.

42.     With every change, Dr. Fazeli, as Medical Director, provided education and re-education on processes and clinical standards including in-service training for new staff.

43.     Dr. Fazeli provided staff with an understanding of treatment options for residents and best practices at every opportunity.

44.     Dr. Fazeli focused on what was best for the patients/residents ethically and clinically.

45.     Plaintiffs' medical team was able to maintain quality through daily active interactions with Defendants' staff and staff education despite the very high staff turnover at the company as a whole.

46.     All discussions and feedback were patient centered, without exception.

47.     Plaintiffs' efforts were part of the reason Defendants' facilities enjoyed a good reputation in the community as a top dementia care facility.  Dr. Fazeli was involved with the very first resident admitted to the Avita facilities and had an established reputation in the Greater Portland area since 2000 as a training geriatric specialist.

48.     At times, nurses at Defendants' facilities asked Dr. Fazeli and Maine Geriatrics to prescribe medications to "calm" residents down.

49.     Although Dr. Fazeli and his staff welcomed the nurses' input, Maine Geriatrics' NPs and Dr. Fazeli did not provide orders for medications unless it was appropriate and consistent with the standard of care for the patient.

50.     As Medical Director, Dr. Fazeli had the duty and responsibility to issue standing orders and protocols for patient care to be carried out by medical assistants and nurses.

51.     Standing orders can be based on national clinical guidelines but medical providers may customize those guidelines based on their own patient population or care environment.

52.     Prior to August 2016, Dr. Fazeli's decision-making for standing orders was not questioned. Standing orders issued by Dr. Fazeli had been in place for over a year with no issues from corporate or local leadership. At most, Plaintiff would be asked to clarify orders and policy when discussing concerns.

53.     On August 17, 2016, the *Bangor Daily News* ran a story about Dr. Fazeli's brother's disappearance from Maine to fight for the Islamic State in Syria. The story quoted Dr. Fazeli about his brother's radicalization and about how he had contacted the FBI to report his concerns two years earlier.

54.     Freeman notified Dr. Fazeli that on about August 18, 2016, Marcia Suddy, Regional Nurse Director for Northbridge Companies, talked about the article to Shawn Bertram, Vice President of Operations for Northbridge Companies and that they both expressed concern that Defendants' business interests would suffer if patients knew about Dr. Fazeli's Middle Eastern origins and Islamic religious background.

55.     After August 2016, nurses at the facilities were told not to follow Dr. Fazeli's standing orders and policy recommendation. No one from any of the corporate Defendants contacted Dr. Fazeli to discuss why the nurses were being given this instruction.

56.     After the *Bangor Daily News* story was published, Dr. Fazeli was treated with increasing bias and disrespect.

57.     In December 2016, Dr. Fazeli emailed his colleagues at the Maine Health Care Association to discuss the handling of standing order medications.

58.     The standard practice had been for the facilities to keep a supply of medications used in standing orders on hand and refill the supply as needed.

59.     A large facility with 50-100 beds does not need to store 50-100 bottles of Tylenol individually labeled for each resident.

60.     Dr. Fazeli had heard from an assisted living facility in Brunswick that a DHHS surveyor told them that each patient needed a separate supply of standing order medications for his or her own use.

61.     Dr. Fazeli asked for help finding the "official" answer.

62.     It took three weeks to resolve this matter because Suddy inserted herself into the discussion and refused to accept the validity of research Dr. Fazeli conducted and the

8

clarification and response to the question that Dr. Fazeli obtained from DHHS and the Maine Health Care Association.

63.     Suddy continued to veto Dr. Fazeli's standing orders even after DHHS clarified that Defendants' facilities are permitted to implement the standing orders, as are other assisted living facilities in Maine.

64.     In  April 2017, Northbridge hosted grand openings for Avita of Stroudwater and Avita of Wells.

65.     Dr. Fazeli attended these openings.

66.     Corporate leadership gave welcome speeches at these events and thanked staff and contractors for making the facilities a success.

67.     No one mentioned Dr. Fazeli or Maine Geriatrics or the medical team of NPs at any of the events.

68.     When Freeman introduced Dr. Fazeli to Vice President Bertram at the grand opening, his only word to Dr. Fazeli was "Hi!" followed by complete silence, before he moved on.

69.     Bertram and his colleagues invited local leadership to informal gatherings every time they visited Maine. Executive Directors and RCDs were always invited. Dr. Fazeli was never invited to any of these gatherings.

70.     From the beginning, one of the terms that Dr. Fazeli asked for in connection with providing onsite geriatric services for the facilities was to avoid using a certain pharmacy.

71.     Dr. Fazeli had experienced issues with that pharmacy with regards to the prompt delivery of narcotics to patients in need of pain management. That particular pharmacy insisted on receiving a faxed hard copy prescription before they would send the medication and would

not take emergency supply orders over the phone from providers pending receipt of prescriptions.

72.     All other long-term care pharmacies in the state, including community pharmacies, would call the ordering physician after receiving a faxed order from the facility then call the provider to confirm an emergency supply while waiting for the actual prescription to be completed and faxed.

73.     Avita of Stroudwater agreed to both conditions and never contracted with the pharmacy in question.

74.     On about May 2016, Defendants' facilities made the decision to switch pharmacies without seeking input from Dr. Fazeli as Medical Director.

75.     Dr. Fazeli offered unsolicited advice, based on his experience.  Dr. Fazeli's feedback regarding the pharmacy was detailed and patient centered and was repeated on numerous occasions. Dr. Fazeli's input was ignored.

76.     There was at least one documented instance where a dying patient suffered due to the delays caused by that pharmacy.

77.     Defendants' facilities eventually had enough issues with the pharmacy that they parted way and contracted with Omnicare in 2018.

78.     Dr. Fazeli's reports regarding the issues with the pharmacy were reports regarding a condition or practice that Dr. Fazeli reasonably believed endangered the health or safety of the residents and were protected reports for purposes of the WPA.  Dr. Fazeli reported these concerns on his own behalf and on behalf of Maine Geriatrics.

79.     In the last quarter of 2017, Dr. Fazeli started an initiative to improve record keeping for patient vaccinations at the facilities and bring it up to acceptable standards.

80.     Vaccination is particularly important for individuals living in nursing homes and assisted living facilities, as disease can spread easily among people living in close proximity.

81.     The contracts between Defendants and Maine Geriatrics states that Defendants' facilities were responsible for maintaining on-site medical records. Vaccination records are part of the medical records.

82.     Dr. Fazeli helped all three facilities revise their intake forms to ensure that they collected relevant information including vaccination records.

83.     Dr. Fazeli gave each facility RCD a form to use to document the residents' (patients') vaccination history.

84.     Renadette, the new RCD at Avita of Wells, and Jean Pecorelli the RCD at Avita of Stroudwater, solicited input from Suddy about using the form that Dr. Fazeli provided.

85.     Suddy told Renadette that under no circumstances was she or her staff to collect vaccination history on existing patients.

86.     Suddy told Renadette and Pecorelli to tell Dr. Fazeli and the Maine Geriatrics NPs to collect vaccination history for existing patients themselves.

87.     Suddy also said that new admissions were the exception and that Avita of Wells staff would obtain vaccination records along with other records on all new admissions.

88.     The RCD at the facilities did not question or object to collecting vaccination records until they were told that "under no circumstances" were they to collect vaccination records for their residents.

89.     At no point did Suddy contact Dr. Fazeli to ask for any clarification or explain her position.  She simply gave her directive in an email to the RCDs to countermand Dr. Fazeli's policy and procedure to collect the data.

11

90.     Suddy's directive was not based on any particular written policy or contractual agreement with Maine Geriatrics.

91.     If Suddy had not intervened, because of unlawful bias and retaliation, all residents' history would have been updated within weeks and the facilities would have developed a better system of collecting information on new admissions to the benefit of all residents.

92.     Defendants did not comply with their own policies and did not ensure that vaccination records were obtained and stored in charts for new admissions as promised.

93.     At Avita of Wells, vaccination information was still missing a year after the facility's agreement to obtain that information for new admissions.

94.     Defendants' facilities would not even place the vaccination record forms in the patients' charts to allow Dr. Fazeli and the Maine Geriatrics' NPs to collect and document the missing vaccination history.

95.     Dr. Fazeli's reports regarding the corporate Defendants' approach to vaccination information were reports regarding a practice or condition that Dr. Fazeli reasonably believed to endanger the health and safety of the residents. Dr. Fazeli reported these concerns on his own behalf and on behalf of Maine Geriatrics.

96.     In 2017, Dr. Fazeli concluded that the needs of a resident at Avita of Stroudwater could not be met and that the resident required a higher level of care.

97.     Pecorelli opposed Dr. Fazeli's direction that the resident be transferred to nursing facility level care and instead advocated for addressing behavioral issues stemming from the resident's advanced dementia through unlawful chemical restraint.

98.     Pecorelli also opposed Dr. Fazeli's recommendations to use non pharmaceutical interventions to address confusion related behaviors that did not meet criteria for use of antipsychotics.

99.     Pecorelli circumvented Dr. Fazeli by advocating to the resident's spouse and the hospice provider for the medications.

100.    As a result, the resident in question was inappropriately and unlawfully medicated with anti-psychotic medications in order to manage behaviors stemming from the resident's dementia.

101.    These actions violated the resident's rights, violated the law, endangered the health and safety of the resident, and deviated from the applicable standard of patient care.

102.    Pecorelli also complained to the Executive Director of Avita of Stroudwater at that time, James Santana, and provided false and misleading information regarding Dr. Fazeli with regard to this situation.

103.    On August 18, 2017, Dr. Fazeli sent an email to Santana explaining the situation including the need to transfer the resident in question into nursing facility level care and the inappropriate use of medications.

104.    Dr. Fazeli also had conversations with Santana and Freeman regarding the situation surrounding this resident and their care.

105.    Dr. Fazeli's reports to Santana and Freeman were protected activity under the WPA and were made on behalf of Dr. Fazeli and Maine Geriatrics.

106.    Pecorelli expressed more generally during her tenure that she was unwilling or unable to manage the behaviors of multiple residents, including the resident referenced in Paragraphs 96-105, without the use of antipsychotic medications.

107.     A few months later and the situation with the resident set out in Paragraphs 96-105, Pecorelli sent an email and letter to Freeman and Suddy providing myriad false and misleading claims regarding Dr. Fazeli.

108.     For example, Pecorelli alleged that Dr. Fazeli behaved unprofessionally and disrespectfully towards Pecorelli and other staff.

109.     These allegations were untrue.

110.     Defendants failed to investigate the allegations made by Pecorelli or provide Dr. Fazeli with a copy of the letter until the MHRC required that Defendants provide a copy of the letter.

111.     Defendants claim that Plaintiffs' contracts were terminated in 2018, in part, based on the allegations set out in Pecorelli's letter.

112.     In light of the falsity of the allegations in the letter and Defendants' failure to investigate or provide a copy of the letter to Dr. Fazeli, the claim that the letter was a factor in the termination decision is pretext.

113.     In addition, Pecorelli harbored retaliatory animus towards Dr. Fazeli because of his opposition to her unlawful actions in connection with the chemical restraint of the resident who required nursing level care and protected reports on this subject.

114.     Pecorelli harbored animus towards Plaintiffs because of their protected activity.

115.     Pecorelli  provided false and misleading information to Freeman and Suddy in order to effectuate the termination of Plaintiffs' contracts.

116.     The decision to terminate Plaintiffs was tainted by Pecorelli's subordinate bias.

117. In May 2018, an issue arose at Avita of Stroudwater in connection with an employee's efforts to influence and direct the medical care and medical decision-making for his mother, who was a resident of the facility.

118. Dr. Fazeli and the Maine Geriatrics NPs spent days discussing with staff and DeMatteo, the RCD, that it was illegal for the employee to attempt to direct and influence his mother's medical treatment, in contradiction of the wishes of the employee's sister, who was the power of attorney.

119. DeMatteo permitted the employee to influence and pressure staff nurses to alter the medical care and medical decision-making for the resident.

120. The inappropriate handling of the situation by DeMatteo and Avita of Stroudwater caused apprehension by staff to implement agreed upon plans and interventions that were opposed by the employee.

121. When DeMatteo was not willing to limit the employee's power and influence, Dr. Fazeli reported the issue directly to the long-term care ombudsman given the facility's conflict of interest.

122. Dr. Fazeli reported his opposition to what he reasonably believed to be a violation of law, a practice or condition that endangered the health and safety of a patient, and a practice that deviated from the applicable standard of patient care.

123. Dr. Fazeli's reports constituted protected activity on the part of Plaintiffs for purposes of the WPA.

124. Even after Dr. Fazeli's call to the ombudsman, DeMatteo pressed for Dr. Fazeli to run his medical recommendations by the employee, to placate him.

125.    Dr. Fazeli explained that this suggestion was inappropriate and would perpetuate the problems associated with the inappropriate handling by DeMatteo and Avita of Stroudwater of the patient's care.

126.    Dr. Fazeli's communications constituted protected activity on behalf of the Plaintiffs.

127.    In May 2018, Dr. Fazeli reported concerns to Feick about two residents at Avita of Stroudwater which Dr. Fazeli believed required a higher level of care than could be provided at Avita of Stroudwater.

128.    Dr. Fazeli explained to Feick, DeMatteo, and the families of the two residents that Avita of Stroudwater was unable to provide the care needed by the residents and that they required nursing facility level care.

129.    Dr. Fazeli reported to Feick, DeMatteo, and the residents' families what he reasonably believed to be a condition or practice that endangered the health and safety of the residents and an act or omission that constitutes a deviation from the applicable standard of care.

130.    These reports constituted protected activity by Plaintiffs for purposes of the WPA.

131.    Feick expressed anger and dissatisfaction with regard to Dr. Fazeli's protected reports.

132.    Like Pecorelli, DeMatteo advocated for the inappropriate use of anti-psychotics to manage behaviors of residents.

133.    Subsequently, Feick and DeMatteo began to take steps to terminate Plaintiffs from their position as Medical Director for Avita of Stroudwater.

134.    Feick and DeMatteo's steps included communications with Suddy and Bertram regarding the termination and replacement of Plaintiffs, communications with the executive

directors and RCDs at Avita of Wells and Stroudwater Lodge, and efforts to find another geriatric practice and geriatrician to replace Dr. Fazeli.

135.    In September 2018, Dr. Fazeli reported to Feick that another Avita of Stroudwater resident needed a higher level of care than he was receiving in assisted living. The resident was incontinent of feces due to advanced dementia.  Staffing levels were not adequate to care for him, and he was defecating in the hallways.

136.    Feick asked Dr. Fazeli to medicate the resident – apply chemical restraints – which is inappropriate, illegal and unethical.

137.    Feick expressed to Dr. Fazeli that he was not putting the interests of the facility first.

138.    Feick made it clear that she resented Dr. Fazeli's reported concerns when she wrote in an email, "…I would like to remind you of your duties as our Medical Director…" The case was eventually referred to the Maine Department of Health and Human Services.

139.    In order to effectuate the termination of Plaintiffs, Feick and DeMatteo provided false and misleading information to Suddy, Bertram, and the executive directors and RCDs for the other facilities.

140.    Feick and DeMatteo took many actions to effectuate the termination of Plaintiffs while Freeman was out on maternity leave.   Freeman was opposed the termination of the Plaintiffs

141.    Feick and DeMatteo claimed that Dr. Fazeli had engaged inappropriate communications with residents, resident's families, and Defendants' employees.

142.    Dr. Fazeli never engaged in inappropriate communications and was never notified of any alleged inappropriate communications.

143.    Feick and DeMatteo communicated this false and misleading information regarding Dr. Fazeli in order to cover up the discriminatory and retaliatory termination of Plaintiffs' contract with Avita of Stroudwater and the other two facilities.

144.    Prior to Feick and DeMatteo's efforts to remove Plaintiffs, neither Avita of Wells or Stroudwater Lodge had any plans to terminate Dr. Fazeli's contracts.

145.    Northbridge Companies played a role in the decisions to terminate Plaintiffs' contracts with the three facilities including the approval of the decisions by and through Bertram and facilitating the process for replacing Plaintiffs by Suddy.  Northbridge Companies' actions were motivated by discriminatory animus towards Plaintiffs' and his practice because of his race, ethnicity, and ancestry in violation of Sec. 1981 as well as animus towards Plaintiffs for their protected activity under the WPA and advocacy for their patients.

146.    Feick and DeMatteo's steps as set out above, including providing false and misleading information regarding Plaintiffs, led Avita of Wells and Stroudwater Lodge to also agree to terminate their contracts with Dr. Fazeli.

147.    According to emails provided by Defendants during the MHRC process, Feick and DeMatteo reported their plan to terminate Plaintiffs' contract on August 3, 2018.

148.    This decision was presented to and approved by Bertram.

149.    Bertram was either provided with false and misleading information to effectuate the unlawful termination or Bertram was aware that there was not a factual basis for terminating Plaintiffs but nonetheless approved the decision due to his own bias.

150.    The emails provided by Defendants reflect that initially Freeman and Stroudwater Lodge planned to retain Plaintiffs as Medical Director at Stroudwater Lodge even if Avita of

Stroudwater planned to terminate his contract but that on August 9, 2018, Stroudwater Lodge changed course and agreed to terminate Plaintiffs' contract with Stroudwater Lodge as well.

151.    Freeman conceded during the MHRC process that if Feick and DeMatteo had not advocated for the replacement of Plaintiffs and decided to terminate Plaintiffs' contract with Avita of Stroudwater, Stroudwater Lodge would have continued their contract with Plaintiffs.

152.    Freeman conceded during the MHRC process that she did not have concerns regarding Dr. Fazeli's performance or behavior at Stroudwater Lodge that would have led Stroudwater Lodge to terminate Plaintiffs' contract.

153.    Feick, DeMatteo, and Avita of Stroudwater engaged in unlawful defamation by knowingly and recklessly providing false information to Avita of Wells and Stroudwater Lodge that led them to terminate their contracts with Plaintiffs.

154.    Feick, DeMatteo, and Avita of Stroudwater engaged in tortious interference with Plaintiffs' contracts with Avita of Wells and Stroudwater Lodge.

155.    Feick, DeMatteo, and Avita of Stroudwater's actions, including the efforts to terminate Plaintiffs contracts with Avita of Stroudwater as well as the contracts with Avita of Wells and Stroudwater Lodge, constituted unlawful retaliation and discrimination under the MWPA.

156.    Defendants' decisions to terminate Plaintiffs' contracts were motivated by animus towards Dr. Fazeli and his practice because of his race, ethnicity, and ancestry.

157.    On October 2, 2018, Defendants gave Plaintiffs 60 days' notice that their contracts with all three facilities were being terminated.

158.    On Friday, October 26, 2018, Feick organized a meet-and-greet for Plaintiffs' patients at Avita of Stroudwater to meet the new Medical Director that was hired to replace

Plaintiffs. The meet and greet was scheduled to coincide with Dr. Fazeli's visit day at the facility.

159.    Feick and DeMatteo steered Plaintiffs' patients to leave Plaintiffs' medical practice and opt for the new Medical Director.

160.    Under Maine law, patients in an assisted living facility have the right to choose any doctor available and had the right to continue treating with Dr. Fazeli and Maine Geriatrics.

161.    Defendants drafted and distributed a carefully worded letter to residents and their families announcing that Dr. Alexandra Barr and Southern Maine Geriatric Associates was taking over as the Medical Director for the facilities. Feick played a role in drafting and disseminating the letter.

162.    Defendants' letter failed to provide any explanation for the termination of Plaintiffs, make any reference to Plaintiffs, or notify residents and their families that they had a right to continue to keep Plaintiffs as their medical provider.  The letter was purposefully drafted to include a very general statement about residents' right to any provider of their choosing but failed to inform them that Plaintiffs were willing and available to continue on as their medical providers or that it was their right to retain Plaintiffs as their medical provider.

163.    Dr. Fazeli was informed by a resident who was also his patient that the resident had been informed by Defendants that Dr. Fazeli had resigned from the Medical Director position.

164.    Defendants provided false and misleading information to residents and their families regarding Plaintiffs' separation from the Medical Director position and residents' rights to retain Plaintiffs as their medical provider in order to discourage them from keeping Plaintiffs

as their medical provider and mislead them into believing that Dr. Fazeli was no longer available.

165.   Defendants' actions were successful in damaging Plaintiffs' business.

166.   Within a week of Defendants' communications, all of Plaintiffs' patients at Avita of Stroudwater and Avita of Wells were transferred to the new doctor. All but a few of Plaintiffs' patients at Stroudwater Lodge also switched to the new provider.

167.   In spite of Plaintiffs' weekly visits at the Stroudwater Lodge, all new residents without a single exception "selected" the new provider.

168.   The loss of so many patients at the three facilities was financially devastating for Plaintiffs.

169.   Typically, when a physician and practice leaves the role of Medical Director at a facility a larger proportion of the patients continue to keep the departing physician and practice as their medical provider.

170.   Defendants defamed Plaintiffs to residents and their families and as a result Plaintiffs lost many of the residents as patients.

171.   Defendants tortiously interfered with Plaintiffs' advantageous economic relationship with their patients.

172.   Defendants' actions following the termination of Plaintiffs' contracts constitute unlawful retaliation and discrimination under the WPA.

173.   Defendants took the actions following the termination of Plaintiffs' contracts because of bias against Dr. Fazeli and his practice because of his race, ethnicity, and ancestry.

174.    During the MHRC investigation, Defendants failed to provide specifics to support the allegations of complaints by nurses against Plaintiffs that allegedly led to the termination of Plaintiffs' contracts.

175.    The only specific evidence of complaints by residents or their families proffered by Defendants to date relates to those instances where Dr. Fazeli advocated against chemically restraining residents and advocated for a higher level of care to meet the needs of certain residents. In these situations, Defendants attempted to garner support from families to oppose Dr. Fazeli's protected activity.

176.    During the MHRC investigation, Defendants' witnesses alleged generally that staff experienced negative interactions with Dr. Fazeli and suggested that these incidents involved inappropriate behavior by Dr. Fazeli, and that these incidents were a factor in the decision to terminate Plaintiffs' contracts.

177.    On occasion, Dr. Fazeli witnessed staff failing to provide appropriate care to residents and in these occasions Dr. Fazeli advised staff regarding what was necessary to provide residents with appropriate care.  During these occasions, Dr. Fazeli was performing his job duties and ensuring appropriate medical care for residents.  Defendants were aware that Dr. Fazeli's communications to staff were appropriate and so the use of these communications as a basis for terminating Dr. Fazeli is evidence of pretext.

178.    Feick and DeMatteo refused to appear at a hearing held by the MHRC to collect testimony regarding the relevant facts in this case.

179.    Feick and DeMatteo did provide false and misleading information in writing to the MHRC.

22

180.    The failure by Defendants to engage in any good faith investigation into allegations regarding Plaintiffs prior to terminating their contracts evidences pretext as well as retaliatory and discriminatory animus.

181.    Defendants' failure to present purported concerns to Plaintiffs before using them as the basis for the termination of contracts is evidence of pretext as well as retaliatory and discriminatory animus.

182.    The change in the treatment of Plaintiffs by Defendants following the August 16, 2016 article in the *Bangor Daily News* and the expressed concern by Defendants' leadership regarding how the information regarding Dr. Fazeli's race/ethnicity could impact their business interests evidences unlawful bias and motive to discriminate.

183.    Defendants violated Plaintiffs' rights by not affording Plaintiffs the respect and influence over decisions regarding policy and procedures due to a Medical Director and enabling biased actions which interfered with Plaintiffs' work.

184.    Defendants arbitrarily overruled Plaintiffs' medical directives in large and small matters, and willfully ignored Plaintiffs' requests and suggestions.

185.    By way of example, Suddy undermined Plaintiffs' authority in all three facilities and made it harder for Plaintiffs to do what other doctors do without question.

186.    The probative timing between Plaintiffs' protected activity and the process that led to Plaintiffs' termination evidences a causal connection.

187.    Feick and DeMatteo violated Plaintiffs' rights by telling patients that Dr. Fazeli resigned and by steering patients to leave Plaintiffs' medical practice and choose the new doctor the facility contracted with as the Medical Director because of unlawful bias and whistleblower retaliation.

188.     Feick and DeMatteo repeatedly used family members to override Plaintiffs'
medical advice that antipsychotic medication was not appropriate for dementia residents,
countered Plaintiffs' medical orders and directed her staff to disregard Plaintiff's directives.

189.     Feick and DeMatteo retaliated against Plaintiffs for advocating for patients to
receive the plan of care that was appropriate for them even when it meant that the patient needed
a higher level of care than what was available at Avita of Stroudwater, making false claims about
Plaintiffs and making a case for the termination of Plaintiffs' contract because of unlawful bias.

190.     Defendants' unlawful actions in this matter caused Plaintiffs' financial damages,
including the loss of the income from the Medical Director contracts and the loss of substantial
income associated with the loss of all patients in two facilities and all but 10 patients in the third
facility.

191.     Defendants acted with malice and/or reckless indifference to Plaintiff's state and
federal rights.

192.     Defendants' actions caused Plaintiffs stress, humiliation, loss to career, and loss to
reputation.

## COUNT I: 42 U.S.C. § 1981

193.     Plaintiffs repeat and reallege each of the allegations set forth in paragraphs 1-192
as if fully set forth herein.

194.     The Defendants are subject to the requirements of § 1981 that, "All persons
within the jurisdiction of the United States shall have the same right …to make and enforce
contracts … as is enjoyed by white citizens."

195.     Defendants terminated Plaintiffs' contracts and engaged in other discrimination
against Plaintiffs because of Dr. Fazeli's race, ethnicity, and ancestry.

196.    Plaintiffs have suffered damages as a result of Defendants' discrimination.

## COUNT II: WPA

197.    Paragraphs 1-196 are incorporated by reference.

198.    Defendants Northbridge, Avita of Stroudwater, Avita of Wells, and Stroudwater Lodge violated the WPA as enforced through the MHRA.

## COUNT III: DEFAMATION

199.    Paragraphs 1-198 are incorporated by reference.

200.    Defendants Feick, DeMatteo, and Avita of Stroudwater intentionally and recklessly published false statements about Plaintiffs that led to the termination of Plaintiffs' contracts and all of the damages that stemmed from the termination of the contracts.

201.    Defendants intentionally and recklessly published false statements to Plaintiffs' patients that led to the termination of the relationships between Plaintiffs and these patients and all of the damages that stemmed from the loss of these patients.

## COUNT IV: TORTIOUS INTERFERENCE

202.    Paragraphs 1-201 are incorporated by reference.

203.    Valid contracts existed between Plaintiffs and Defendants Avita of Stroudwater, Avita of Wells, and Stroudwater Lodge.

204.    Defendants' Feick, DeMatteo, Avita of Stroudwater, and Northbridge Companies were aware of the contracts and interfered with those contracts with the intention of interference with and ending the contracts.

205.    Defendants' Feick, DeMatteo, and Avita of Stroudwater, and Northbridge Companies' interference with Plaintiffs' contracts proximately caused damages to Plaintiffs.

206.    Advantageous economic relationships existed between Plaintiffs and patients that were residents at the three facilities.

207.    Defendants were aware of these advantageous economic relationships and interfered with those relationships with the intention of interference with and ending those relationships.

208.    Defendants' interference with Plaintiffs' advantageous economic relationships proximately caused damages to Plaintiffs.

<u>PRAYER FOR RELIEF</u>

Plaintiffs respectfully request that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendants to be in violation of their rights;

B.    Enjoin Defendants, their agents, successors, employees, and those acting in concert with it from continuing to violate their rights;

C.    Order Defendants to reinstate Plaintiffs' contracts or award front pay to Plaintiffs;

D.    Award lost future earnings to compensate Plaintiffs for the diminution in expected earnings caused by Defendants' violations;

E.    Award damages for lost earnings including loss of Medical Director income and the loss of income from the patient relationships that were ended as a result of Defendants' violations;

F.    Award compensatory damages in an amount to be determined at trial;

G.    Award punitive damages in an amount to be determined at trial;

H.    Award nominal damages;

I.    Award attorney's fees, including legal expenses, and costs;

J.      Award prejudgment interest;

K.      Permanently enjoin Defendants from engaging in any employment practices which violate 42 U.S.C. § 1981 and WPA;

L.      Require Defendants Northbridge Companies, Avita of Stroudwater, Avita of Wells, and Stroudwater Lodge to mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate discrimination or retaliation in the future;

M.      Require that Defendants Northbridge Companies, Avita of Stroudwater, Avita of Wells, and Stroudwater Lodge post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

N.      Require that Defendants Northbridge Companies, Avita of Stroudwater, Avita of Wells, and Stroudwater Lodge train all management level employees on the protections afforded by 42 U.S.C. § 1981 and WPA; and

O.      Grant to Plaintiff such other and further relief as may be just and proper.

Dated:  September 28, 2020                    /s/ Chad T. Hansen
                                              Chad T. Hansen
                                              Attorney for the Plaintiff

                                              EMPLOYEE RIGHTS GROUP
                                              92 Exchange Street 2nd floor
                                              Portland, Maine 04101
                                              Tel. (207) 874-0905
                                              Fax (207) 874-0343
                                              chad@employeerightslaw.attorney