## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| JABBAR FAZELI, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) 2:20-cv-00350-JDL |
| | ) |
| NORTHBRIDGE | ) |
| STROUDWATER | ) |
| LODGE II LLC, et al., | ) |
| | ) |
| Defendants. | ) |

### ORDER ON DEFENDANTS' MOTION TO DISMISS AND PLAINTIFFS' MOTION FOR LEAVE TO AMEND

Dr. Jabbar Fazeli and Maine Geriatrics, LLC (collectively, "Plaintiffs"), bring this action against three assisted living facilities in southern Maine, the facilities' corporate parent, and two individual administrators (collectively, "Defendants"), alleging several claims arising out of the termination of the Plaintiffs' contracts to provide medical services at those facilities: (1) a violation of 42 U.S.C.A. § 1981 (West 2021); (2) a violation of the Maine Whistleblowers' Protection Act (MWPA), 26 M.R.S.A. §§ 831-840 (West 2021); (3) defamation; and (4) tortious interference. The Defendants have moved to dismiss the Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) (ECF No. 8). The Plaintiffs have filed a motion for leave to file an amended complaint containing further allegations in support of their defamation and tortious-interference claims (ECF No. 24). For the reasons that follow, I grant the Plaintiffs' motion for leave to amend and deny the Defendants' motion to dismiss.

## I. FACTUAL BACKGROUND

The following facts are derived from the Complaint and from a newspaper article that is specifically referenced in the Complaint, which I may consider on a motion to dismiss. *See Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

### A.   Overview

Dr. Fazeli is a medical doctor who practices through Maine Geriatrics, a Maine limited liability company of which he is the sole member.  Defendant Northbridge Companies ("Northbridge") owns and operates assisted living facilities, including Defendants Stroudwater Lodge, Avita of Stroudwater, and Avita of Wells (collectively, "the Avita Facilities," and with Northbridge, the "Corporate Defendants").[1]  The Corporate Defendants share ownership and management, as well as control of their labor relations.  At various times, including from May 2018 onwards, Defendant Katrin Feick was Executive Director at Avita of Stroudwater and Defendant Orlene DeMatteo was that facility's Resident Care Director (RCD) (collectively, Feick and DeMatteo are the "Individual Defendants").

In 2015 and 2016, the Plaintiffs entered into contracts with all three Avita Facilities to provide medical services, resulting in Dr. Fazeli becoming the Medical

---

[1] To be precise, there are seven Corporate Defendants: Northbridge Companies, which has been the corporate parent of all three facilities throughout the relevant time period; Northbridge Stroudwater Assisted Living, LLC, and its successor Northbridge Stroudwater Lodge II, LLC, which operate Stroudwater Lodge; Avita Stroudwater, LLC, and its successor Avita Stroudwater II, LLC, which operate Avita of Stroudwater; and Avita Wells, LLC, and its successor Avita Wells II, LLC, which operate Avita of Wells.  The successions of the three LLCs occurred in January 2020, after the events at issue.  The specific taxonomy of and relationships between these entities is not relevant to the matters addressed in this Order.

Director of all three.  As Medical Director, Dr. Fazeli's work included "conduct[ing] weekly rounds at the three facilities," and he "was involved in strategic planning, community education and marketing."  ECF No. 1 ¶ 36.  Maine Geriatrics "provided onsite visits" by its employee nurse practitioners, and "provided 24/7 medical coverage for the three facilities."  *Id.* ¶ 37.  Additionally, residents were allowed to choose their primary care providers, and by November 2018 Dr. Fazeli had been chosen as primary care provider by approximately 80% of the residents at the three facilities.

## B.    2016 Newspaper Article and Aftermath

On August 17, 2016, the Bangor Daily News published a story about Dr. Fazeli's brother, who had left Maine to fight for the Islamic State in Syria.  The story identified Dr. Fazeli by name, stating also that he was a "Portland physician" and "geriatrician," and described his growing up with his brother in Iran, including details about their religious upbringing.  ECF No. 8-1 at 4.  The story included extensive statements from Dr. Fazeli, who recounted his experience contacting the FBI to inform them about his brother's radicalization.

The Plaintiffs allege that the day after the article was published, Marcia Suddy and Shawn Bertram—Regional Nurse Director and Vice President of Operations for Northbridge, respectively—discussed the article and "both expressed concern that [the] Defendants' business interests would suffer if patients knew about Dr. Fazeli's Middle Eastern origins and Islamic religious background."  ECF No. 1 ¶ 54.  The Plaintiffs also allege that after the story was published, "nurses at the facilities were told not to follow Dr. Fazeli's standing orders and policy recommendation[s]."  *Id.* ¶

3

55.  For instance, in December 2016, Dr. Fazeli began a discussion among facility administrators about the facilities' practices of keeping a communal supply of medications to fill standing orders, rather than keeping a separate supply earmarked for each patient, after learning that a state agency might require the latter practice. "Suddy inserted herself into the discussion and refused to accept the validity of research" that Dr. Fazeli had conducted to resolve the issue.  *Id.* ¶ 62.  Suddy allegedly "continued to veto Dr. Fazeli's standing orders" after the state agency confirmed that Dr. Fazeli's practices were permitted.  *Id.* ¶ 63.

## C.    Retaliation and Ouster

The Plaintiffs allege that during the course of their work at the Avita Facilities, Dr. Fazeli made a series of critical reports to the facilities' managers regarding administrative and medical practices there, and that the Defendants retaliated against him for those reports.  The reports related to the use of a particular pharmacy, the collection of vaccination histories from current facility residents, the use of certain medications, and the level of medical care that could be provided at the Avita Facilities (that is, before a resident might need to be transferred to a facility that could provide more intensive care).  The Complaint also asserts that "Feick expressed anger and dissatisfaction" about Dr. Fazeli's reports, *id.* ¶ 131, and that beginning in May 2018, Feick and DeMatteo allegedly "began to take steps to terminate" the Plaintiffs' contract with Avita of Stroudwater, *id.* ¶ 133.

The Complaint asserts that, "[i]n order to effectuate" that termination, "Feick and DeMatteo provided false and misleading information to Suddy, Bertram, and the executive directors and RCDs for the other facilities."  *Id.* ¶ 139.  For instance, Feick

and DeMatteo allegedly "claimed that Dr. Fazeli had engaged in inappropriate communications with residents" and employees of the three facilities.  *Id.* ¶ 141.  On August 3, 2018, Feick and DeMatteo allegedly told Bertram that they planned to terminate the Fazeli contract with Avita of Stroudwater.  Bertram "approved" the plan.  *Id.* ¶ 148.

According to the Plaintiffs, Feick's and DeMatteo's actions led to the termination of the Plaintiffs' contracts with the other two facilities as well.  For instance, the Complaint alleges that the Executive Director of Stroudwater Lodge "conceded" during a state administrative proceeding "that if Feick and DeMatteo had not advocated for the replacement of Plaintiffs . . . , Stroudwater Lodge would have continued their contract with Plaintiffs."  *Id.* ¶ 151.  On August 9, 2018, Stroudwater Lodge proposed to terminate its contract with the Plaintiffs.  Again, the termination was approved by Bertram, and Suddy "facilitat[ed] the process for replacing Plaintiffs."  *Id.* ¶ 145.

On October 2, 2018, the Defendants gave the Plaintiffs sixty days' notice that the contracts with all three facilities were being terminated.

**D.   Alleged Interference with Retaining Patients**

The Complaint also alleges that during the transition period to the new Medical Director and medical services provider, the Defendants interfered with the Plaintiffs' economic interest in continuing to provide individual medical services to patients who resided at the assisted living facilities.  Specifically, on October 26, 2018—about halfway through the roughly 60-day transition period—Feick scheduled a meet-and-greet at Avita of Stroudwater for the residents to meet the new Medical

5

Director.  "The meet-and-greet was scheduled to coincide with Dr. Fazeli's visit day at the facility," and "Feick and DeMatteo steered [residents] to leave Plaintiffs' medical practice and opt for the new Medical Director."  *Id.* ¶¶ 158-59.

The Complaint also alleges that the Defendants, including Feick but not DeMatteo, "drafted and distributed" a letter to the residents at all three facilities announcing the new Medical Director (the "Announcement Letter").  *Id.* ¶ 161.  The Announcement Letter did not explain the circumstances of Dr. Fazeli's departure—it did not refer to him at all—or notify residents that they had the choice to keep Dr. Fazeli as their individual medical provider, although it did "include a very general statement about [their] right to any provider of their choosing."  *Id.* ¶162.  Additionally, the Complaint asserts that the Defendants informed at least one resident that Dr. Fazeli had resigned.

By November 2018, "about 80% of residents" had previously selected Dr. Fazeli as their personal physician.  *Id.* ¶ 40.  But "[w]ithin a week" after the Announcement Letter was disseminated, all of the residents at two of the facilities transferred their business to the new provider, and only ten residents at the third facility stayed with Dr. Fazeli.  *Id.* ¶ 166.

## E.  Procedural History

The Plaintiffs filed their Complaint on September 28, 2020, asserting (1) a violation of 42 U.S.C.A. § 1981; (2) a violation of the MWPA; (3) defamation; and (4) tortious interference.  The Defendants responded with their Motion to Dismiss the Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) (ECF Nos. 7, 8).  The Court held a hearing on the Defendants' motion on January 28, 2021 (ECF

No. 23).  On March 8, 2021, the Plaintiffs filed their motion seeking leave to file an amended complaint that would add several factual allegations relevant to the defamation and tortious interference claims (ECF No. 24).

## II.  LEGAL STANDARD

### A.     Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss, a complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (quoting *Grajales v. P.R. Ports. Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)).  To assess a complaint's adequacy, courts apply a "two-pronged approach," *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011): first, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," and second, the court will "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief," *Schatz*, 669 F.3d at 55. Determining the plausibility of a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The plausibility analysis also permits consideration of any "obvious alternative explanation" for the alleged facts.  *Id.* at 682 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)).

## B.   Federal Rule of Civil Procedure 9(b)

Because the Plaintiffs' tortious interference claim requires a showing of fraud,[2] it is subject to Rule 9(b), which requires that a complaint "state with particularity the circumstances constituting fraud."   "[T]he circumstances to be stated with particularity under Rule 9(b) generally consist of the who, what, where, and when of the allegedly misleading representation." *Dumont v. Reily Foods Co.*, 934 F.3d 35, 39 (1st Cir. 2019) (alterations omitted) (quoting *Kaufman v. CVS Caremark Corp.*, 836 F.3d 88, 91 (1st Cir. 2016)). "[W]hile a federal court evaluates whether a party has adequately pleaded the elements of fraud according to state law standards, the assessment of whether a party has adequately pleaded the circumstances of fraud is measured by federal law." *Goodman v. Pres. & Trs. of Bowdoin Coll.*, 135 F. Supp. 2d 40, 59 (D. Me. 2001) (citing *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985)).

## C.   Federal Rule of Civil Procedure 15(a)(2)

"Rule 15(a) provides that a party may amend its pleading with 'the court's leave,' and that '[t]he court should freely give leave when justice so requires.'" *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 55 (1st Cir. 2008) (quoting Fed. R. Civ. P. 15(a)).   However, the court may deny leave to amend on the ground, among others, of "futility of amendment." *Id.* at 56 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).   "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Glassman v. Computervision Corp.*, 90 F.3d 617,

---

[2] Under Maine law, tortious interference "requires a plaintiff to prove: (1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract or advantage through fraud or intimidation; and (3) that such interference proximately caused damages." *Rutland v. Mullen*, 2002 ME 98, ¶ 13, 798 A.2d 1104, 1110.   The Complaint does not allege that the Defendants' actions involved any intimidation, so the tortious interference claim sounds in fraud.

623 (1st Cir. 1996).  "In reviewing for 'futility,' the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion." *Id.*

## III.  DISCUSSION

The Defendants challenge the Plaintiffs' § 1981 and MWPA claims on different grounds than the defamation and tortious-interference claims, and the Plaintiffs' motion for leave to amend is entirely focused on their defamation and tortious-interference claims.  Additionally, the Defendants oppose the Plaintiffs' motion for leave to amend arguing that amendment would be futile because, even with the proposed additional allegations, the Plaintiffs fail to state a claim for defamation or tortious interference.

Accordingly, I proceed as follows.  First, I address the Plaintiffs' § 1981 and MWPA claims, and the Defendant's arguments for dismissal of those claims, in turn.  Next, I analyze the defamation and tortious-interference claims as set forth in the original Complaint.  Finally, I address the Plaintiffs' proposed amendment to the Complaint.

## A.    Count One: 42 U.S.C.A. § 1981

Title 42 U.S.C.A. § 1981(a) provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  To state a claim under § 1981, a plaintiff must establish that "(1) she is a member of a racial minority; (2) the defendant discriminated against her on the basis of her race; and (3) the discrimination implicated one or more of the activities listed in the statute, including the right to make and enforce contracts." *Hammond v. Kmart Corp.*, 733 F.3d 360, 362 (1st Cir. 2013).  Additionally, a § 1981 plaintiff must "plead and

ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020).   Again, at the pleading stage, the plaintiff "need not *establish*" a causal link between his race and the adverse action; instead, "the facts contained in the complaint need only show that the claim of causation is plausible." *Rodríguez-Reyes*, 711 F.3d at 56; *see Corson v. Modula, Inc.*, No. 2:20-CV-104-DBH, 2020 WL 4194498, at *5-6 (D. Me. July 21, 2020) (explaining why factual allegations that would satisfy the prima facie evidentiary standard, under the burden-shifting framework for indirect discrimination claims, are sufficient to state a plausible claim of causation).

The Defendants argue that the Complaint fails to state a claim under § 1981 for several reasons: (1) the Complaint does not allege discrimination on the basis of race, ethnicity, or national origin; (2) the Complaint does not allege that any such discrimination was a but-for cause of the contracts' termination; and (3) Feick and DeMatteo cannot be held individually liable under § 1981.   I address each argument in turn.

### 1.   Discriminatory Basis

Section 1981 protects against discrimination on the basis of more than just "race" as such; the statute is "intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *see also id.* at 614 (Brennan, J., concurring) ("[T]he line between discrimination based on ancestry or ethnic characteristics . . . and discrimination

based on place or nation of origin . . . is not a bright one." (internal quotation marks and alterations omitted)); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 224-25 (4th Cir. 2016) (explaining that "many of the 'races' which members of Congress perceived to be covered by § 1981 comprised ancestrally related peoples more easily identifiable by their cultural affinities than their physiognomic characteristics" (citing *Saint Francis Coll.*, 481 U.S. at 612-13)).  The Complaint asserts that Dr. Fazeli "is a Muslim Arab and was born in Iran."  ECF No. 1 ¶ 31.  It also alleges that, on the same day or soon after the Bangor Daily News article was published, Suddy and Bertram "both expressed concern that [the] Defendants' business interests would suffer if patients knew about Dr. Fazeli's Middle Eastern origins and Islamic religious background."  ECF No. 1 ¶ 54.

The Defendants do not challenge the proposition that Dr. Fazeli's Arab ethnicity may be protected by § 1981; instead, they argue that the "true basis" for the alleged discrimination was not Dr. Fazeli's race or ethnicity, but rather his "personal association with a terrorist," which is not protected.  ECF No. 8 at 6.  In other words, the Defendants contend that the adverse actions occurred only because of Dr. Fazeli's actual—not merely stereotyped or conjectural—family link to ISIS, which they assert had nothing to do with Dr. Fazeli's race or ethnicity.

The article did not draw an explicit connection between ISIS and Dr. Fazeli's Iranian ancestry, yet it spotlighted his ethnicity in the context of a news event that reinforced negative stereotypes about people of Iranian descent.  The Complaint also alleges that after the story was published, Suddy began to meddle in and undermine Dr. Fazeli's management of the facilities' medical practices, such as by interfering

with his resolution of the standing-order issue.  These allegations support a plausible inference that even though the ostensible subject of the article was Dr. Fazeli's brother's involvement in ISIS, any discrimination based on Dr. Fazeli's family link to an ISIS member is impossible to disentangle from the negative stereotype reinforced by the subject of the article.  Viewed in the light most favorable to the nonmoving party, as I must at this early stage of this proceeding, the Complaint plausibly alleges that the discrimination directed toward Dr. Fazeli was substantially "based on" Dr. Fazeli's race, ethnicity, or national origin.  Thus, the Complaint states a claim that Dr. Fazeli was subjected to discrimination in violation of § 1981 "because of [his] ancestry or ethnic characteristics."  *Saint Francis Coll.*, 481 U.S. at 613.

### 2.    But-For Causation

The Defendants also argue that, even if the Complaint sufficiently ties Dr. Fazeli's race or ethnicity to the alleged discrimination, it does not adequately allege that any discrimination was a but-for cause of the Defendants' decision to terminate the contracts.

Recently, in *Comcast*, the Supreme Court affirmed the principle that a plaintiff asserting a § 1981 claim "must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right."  140 S. Ct. at 1019. At the pleading stage, the question is whether the complaint "'contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face' under the but-for causation standard."  *Id.* (alteration omitted) (quoting *Iqbal*, 556 U.S. at 678-79).  Although a plaintiff "need not plead facts sufficient to establish a prima facie case" of discrimination to survive a motion to dismiss, she "must plead

enough facts to make entitlement to relief plausible in light of the evidentiary standard that will pertain at trial." *Rodríguez-Reyes*, 711 F.3d at 54.

In addition to sufficiently pleading a prima facie case of discrimination, which I describe in greater detail below, the Complaint plausibly alleges a direct connection between Bertram's and Suddy's alleged discriminatory motive and the impairment of the Plaintiffs' contracts.[3]   Regarding termination, the Complaint asserts that Bertram "approved" Feick and DeMatteo's plan to terminate the contract with Avita of Stroudwater "due to his own bias."  ECF No. 1 ¶ 149.  Previously, Bertram had allegedly expressed a desire to distance the Avita Facilities from Dr. Fazeli because of his race or ethnicity.  It is plausible that the Corporate Defendants would not have terminated the Fazeli contracts but for Bertram's allegedly discriminatory motive and his involvement in the decision.

What's more, termination of a contract is not the only contractual impairment that § 1981 prohibits: "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."   42 U.S.C.A. § 1981(b) (quoting 42 U.S.C.A. § 1981(a)).  Here, the Complaint also alleges that Suddy interfered with the Plaintiffs' performance of their contracts in several ways, beginning soon after Suddy's conversation with Bertram.  For instance, when Dr. Fazeli was addressing the facilities' standing-order practices, Suddy "inserted herself into the discussion and refused to accept the validity of research" that Dr.

---

[3] The Defendants do not dispute that Bertram's and Suddy's actions may be imputed to the Corporate Defendants for § 1981 purposes.  *See Springer v. Seaman*, 821 F.2d 871, 881 (1st Cir. 1987).

Fazeli conducted on the issue, undermining his attempts to implement a state agency-approved practice. ECF No. 1 ¶ 62. Suddy also allegedly interfered with Dr. Fazeli's efforts to collect vaccination records for existing patients. The Complaint alleges that these actions "undermined [Dr. Fazeli's] authority" and "made it harder for [him] to do what other doctors do without question." *Id.* ¶ 185. Thus, the Complaint plausibly alleges that but for Suddy's allegedly race- or ethnicity-based discriminatory animus, the Plaintiffs' performance of their contracts would not have been impaired.

Therefore, the Complaint adequately pleads but-for causation as to the corporate Defendants.

### 3.    Individual Defendants

Finally, the Individual Defendants assert that because they were not Dr. Fazeli's supervisors, they cannot be held liable under § 1981. They also contend that the Complaint does not plead but-for causation as to them. I address each argument in turn.

### i.    Individual Liability Under 42 U.S.C.A. § 1981

Section 1981 does not contain any express limitation on who may be liable for violating the rights it creates, and courts have interpreted the statute to support liability for any person who interferes with the plaintiff's contractual rights on the basis of race, even if that individual is not a contracting party. *See, e.g.*, *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015) ("An individual may be held liable under [§ 1981] . . . only if that individual is personally involved in the alleged deprivation." (internal quotation marks omitted)); *Al-Khazraji v. Saint Francis Coll.*,

784 F.2d 505, 518 (3d Cir. 1986), *aff'd*, 481 U.S. 604; *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 753 (7th Cir. 1985).

The Complaint plausibly alleges—and the Defendants do not really dispute—that the Individual Defendants were substantially and personally involved in terminating the Plaintiffs' contracts. For instance, the Complaint alleges that in the course of advocating for the termination of the Plaintiffs' contract with Avita of Stroudwater, Feick and DeMatteo falsely accused Dr. Fazeli of having made "inappropriate communications" with residents and employees, ECF No. 1 ¶ 141, and that those accusations led directly to the other Avita Facilities' decisions to cut ties with the Plaintiffs. These allegations are sufficient to plead that the Individual Defendants were personally involved in the termination of the contracts to support a § 1981 claim against them.

### ii.    Race- or Ethnicity-Based Discrimination

The Individual Defendants also contend that the absence of any allegations of an overtly race- or ethnicity-based discriminatory motive forecloses the Complaint's § 1981 claims against them. The Individual Defendants are correct that the Complaint does not contain any factual allegations directly linking them to any overt acts of discrimination, such as Bertram or Suddy's allegedly discriminatory conversation.[4]  However, as I will explain, the Complaint does allege facts that, if

---

[4] There is no allegation, for instance, that Feick or DeMatteo ever discussed Dr. Fazeli's race or ethnicity with Bertram or Suddy.  And it is unclear whether Feick or DeMatteo even worked for Northbridge when the Bangor Daily News article was published in August 2016: The Complaint states that (1) at all times relevant to the Complaint, Feick was Avita of Stroudwater's Executive Director and DeMatteo was its RCD; (2) "[b]etween 2013 and 2018, leadership changed several times at Avita of Stroudwater," *id.* ¶ 41; (3) in "the last quarter of 2017," the RCD at Avita of Stroudwater was Jean Pecorelli, *id.* ¶ 79; (4) in August 2017, the Executive Director at Avita of Stroudwater was James

true, are sufficient to establish a prima facie case of discrimination as to the Individual Defendants, which is enough to render the Plaintiffs' discrimination claim plausible.

A plaintiff who adequately states a prima facie case of discrimination under the *McDonnell Douglas* burden-shifting framework satisfies the pleading standard so long as there is no obviously legitimate reason for the adverse action. *See Corson*, 2020 WL 4194498, at *5. Because a plaintiff may prevail on a discrimination claim, even at summary judgment, without introducing direct evidence of bias, she need not plead facts that demonstrate overt discrimination in order to survive a motion to dismiss: "If the pleaded facts meet the prima facie standard, that should suffice" to satisfy the plausibility standard. *Id.*; *accord Littlejohn*, 795 F.3d at 311 ("We conclude that *Iqbal*'s [plausibility] requirement applies to Title VII complaints of employment discrimination, but does not affect the benefit to plaintiffs pronounced in the *McDonnell Douglas* quartet."); *Sharifi Takieh v. Banner Health*, --- F. Supp. 3d. ---, No. CV-19-05878-PHX-MTL, 2021 WL 268808, at *15 n.10 (D. Ariz. Jan. 27, 2021) (explaining the same in the § 1981 context).

Contrary to the Defendants' insistence, this logic does not depend upon the precise causation requirement. The prima facie case is an evidentiary standard primarily designed to uncover an otherwise hidden connection between a plaintiff's protected characteristics and the adverse action, not to assess the closeness of that connection vis-à-vis causation. *See Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir.

---

Santana; and (5) in May 2018 and apparently thereafter, Feick and DeMatteo were the Executive Director and RCD at Avita of Stroudwater.

1979) ("Proof of the McDonnell Douglas-type prima facie case assures the plaintiff his day in court despite the unavailability of direct evidence, and entitles him to an explanation from the [defendant] for whatever action was taken."). Although the elements of the prima facie case undoubtedly "may vary depending on the context," *T & S Serv. Assocs., Inc. v. Crenson*, 666 F.2d 722, 725 n.3 (1st Cir. 1981), direct evidence of discrimination is not the *sine qua non* of the prima facie standard even for claims where but-for causation has long been the established requirement. For instance, a prima facie case of age discrimination under the Age Discrimination in Employment Act—which requires but-for causation, *see Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)—can be made by showing that "(1) [the plaintiff] was at least forty years old; (2) she was qualified for the position she had held; (3) she was fired; and (4) the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services." *Gómez-González v. Rural Opportunities, Inc.*, 626 F.3d 654, 662 (1st Cir. 2010) (quotation marks omitted). In other words, the prima facie standard under the Age Discrimination in Employment Act does not require the plaintiff to show direct evidence of discriminatory animus by the employer, even though the ultimate causal requirement is but-for causation, and the Defendants have not identified any reason for a different rule in the § 1981 context.

Turning to the prima facie standard applicable here, the Complaint alleges facts that, if true, are sufficient to establish a prima facie case that the Individual Defendants discriminated against Dr. Fazeli because of his race or ethnicity. A prima facie case of discrimination under § 1981 requires "a showing that [the plaintiff] was a member of a protected class and qualified for the employment he held, that his

employer took an adverse employment action against him, and that his position remained open for (or was filled by) a person whose qualifications were similar to his." *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 19 (1st Cir. 1999). The Complaint alleges that Dr. Fazeli is a "Muslim Arab," a protected class, ECF No. 1 ¶ 31; that he and Maine Geriatrics were qualified for, and adequately performed, the contracts, and that their "efforts were part of the reason [the Avita Facilities] enjoyed a good reputation in the community as a top dementia care facility," *id.* ¶ 47; that Feick and DeMatteo were personally involved in terminating those contracts, for the reasons previously described; and that the contracts to provide medical services and the position of Medical Director were filled by a similarly qualified doctor and entity.

This is all that is needed to plausibly allege that, but for the Individual Defendants' allegedly discriminatory conduct, Dr. Fazeli's contractual rights under § 1981 would not have been impaired.[5] Accordingly, the Plaintiffs have stated a claim against the Individual Defendants under § 1981.

## B.   Count Two: Maine Whistleblowers' Protection Act ("MWPA")

The Defendants contend that because Dr. Fazeli and Maine Geriatrics were independent contractors, not employees of the Defendants, they are not protected by the MWPA.

The MWPA, in conjunction with the Maine Human Rights Act, 5 M.R.S.A. § 4621 (West 2021), "provides a right of action to . . . whistleblowers who have suffered

---

[5] The Individual Defendants also argue that the Plaintiffs cannot establish but-for causation on their § 1981 claim because the Complaint also alleges that the Individual Defendants' motivation for terminating the contracts was retaliation. But a party "may state as many separate claims . . . as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3).

retaliatory discharge or other adverse employment actions." *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 6, 954 A.2d 1051, 1053. The "protection afforded by the [MWPA]" is limited to "(1) employees (2) who report to an employer (3) about a violation (4) committed or practiced by that employer." *Id.* ¶ 8, 954 A.2d at 1054 (footnote omitted). The statute defines "employee" as follows:

> "Employee" means a person who performs a service for wages or other remuneration under a contract of hire, written or oral, expressed or implied, but does not include an independent contractor engaged in lobster fishing. Employee includes school personnel and a person employed by the State or a political subdivision of the State.

26 M.R.S.A. § 832(1). "Employer" is defined in relation to "employee," *see id.* 832(2), and "person" is defined to include a corporation "or any other legal entity," *id.* 832(3). The Maine Law Court has not answered the question the Defendants' argument raises: is an independent contractor an "employee" for purposes of the MWPA?

This Court looks to Maine law to guide its interpretation of a Maine statute. *See O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 72-73 (1st Cir. 2017). "The first step in statutory interpretation requires an examination of the plain meaning of the statutory language in the context of the whole statutory scheme." *Sunshine v. Brett*, 2014 ME 146, ¶ 13, 106 A.3d 1123, 1128 (internal quotation marks omitted). "Only if the statutory language is ambiguous—that is, reasonably susceptible to more than one interpretation—will [a court] consider other indicia of legislative intent." *Id.*

The statute's definition of "employee" is written in broad terms—"a person who performs a service for wages or other remuneration under a contract of hire"— that exceed the general agency-law definition of employee. *See Picher v. Roman Catholic Bishop of Portland*, 2009 ME 67, ¶ 32, 974 A.2d 286, 296 (noting that for purposes of

vicarious liability, "an employee is an agent whose principal controls or has the right to control the manner and means of the agent's performance of work" (quoting Restatement (Third) of Agency § 707(3)(a) (Am. Law Inst. 2006)).  Additionally, the fact that the statute expressly excludes independent contractors "engaged in lobster fishing" indicates that independent contractors who are not engaged in lobster fishing are protected by the statute so long as they are performing services under a contract of hire.  The Defendants' contrary interpretation would make the "lobster fishing" clause redundant.  *See Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 22, 107 A.3d 621, 628 ("We reject interpretations that render some language mere surplusage.").  This conclusion is consistent with the one other published decision from this District that has previously considered the question.[6]  *See Allstate Ins. Co. v. Chretien*, No. 1:12-CV-38-DBH, 2013 WL 6531751, at *20 (D. Me. Nov. 5, 2013) (noting that the definition of employee "is clearly drawn in broad enough terms to extend [the MWPA's] protection to an independent contractor") (*rec. dec., aff'd* Dec. 12, 2013).

Because the statute's plain meaning unambiguously establishes that the MWPA protects all independent contractors "under a contract of hire" (other than those engaged in lobster fishing, of course), the Complaint states a MWPA claim.[7]

---

[6] I am not persuaded by the Defendants' contention that the First Circuit's opinion in *Winslow v. Aroostook County*, 736 F.3d 23 (1st Cir. 2013), has any bearing on the issue.  In that case, there was no contractual relationship whatsoever between the MWPA plaintiff and the defendant; the *Winslow* court neither addressed nor had reason to address the types of contractual relationships to which the MWPA applies.

[7] The Defendants do not dispute that if the MWPA covers independent contractors under a contract of hire, both Plaintiffs fall within that category.

**C.      Counts Three and Four: Defamation and Tortious Interference**

Counts Three and Four of the Complaint raise claims of defamation and tortious interference under Maine law, respectively.  The Defendants contend that the factual allegations are insufficiently particularized or detailed to satisfy the pleading requirements for either of these torts; they also argue that the allegedly defamatory and tortious statements are protected by a conditional privilege.  For reasons I will explain, both the pleading requirements and the substantive elements are similar for both claims.  To proceed, therefore, I assess each claim in full based on the allegations in the original Complaint.  I then turn to the Plaintiffs' proposed amendments to determine whether—and if so, how—the additional factual allegations affect the analysis.

**1.      Tortious Interference**

**i.      Pleading Requirement: Particularity**

As I have discussed, the Complaint's tortious interference claim sounds in fraud and is therefore subject to Rule 9(b).  Rule 9(b)'s "core purposes" are "to place the defendants on notice and enable them to prepare meaningful responses . . . and to safeguard defendants from frivolous charges that might damage their reputation." *Dumont*, 934 F.3d at 39 (alteration and internal quotation marks omitted).  To that end, "the circumstances to be stated with particularity under Rule 9(b) generally consist of the who, what, where, and when of the allegedly misleading representation."  *Id.* at 38 (alterations omitted) (quoting *Kaufman*, 836 F.3d at 91).  However, "the adequacy of particularized allegations under Rule 9(b) is case- and context-specific."  *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d

71, 81 (2d Cir. 2017). For instance, in *Dumont*, a customer claimed that a flavored coffee product was deceptively labeled, but did not specify the dates on which she purchased the coffee. 934 F.3d at 39. The court concluded that the allegation that she purchased the coffee was sufficient to satisfy Rule 9(b) because "the complaint ma[de] clear that the purchase occurred when the defendants were selling the . . . coffee in the package pictured in the complaint," and the defendants could not explain "why further particularity on the date is relevant." *Id.*

Most of the Complaint's allegations do not meet this standard, including the following: (1) "Feick and DeMatteo claimed that Dr. Fazeli had engaged [in] inappropriate communications with residents, resident's families, and Defendants' employees," ECF No. 1 ¶ 141; (2) "Feick and DeMatteo steered [Fazeli's] patients to leave [his] medical practice and opt for the new Medical Director," *id.* ¶ 159; and (3) one "resident had been informed by Defendants that Dr. Fazeli had resigned from the Medical Director position," *id.* ¶ 163. The defect in all three allegations is their vagueness: they do not state how, where, to whom, or remotely when these statements were made, nor could that information reasonably be deduced from context. For instance, the Complaint alleges that the relationship between the Plaintiffs and Defendants was deteriorating as early as May 2018 but that the Plaintiffs continued in their roles until November of that year, and the Complaint does not explain when within this period these allegedly tortious statements were made. This six-month range is too broad to fulfill the notice and preparation purposes of Rule 9(b), given the nature of the alleged tortious statements. Thus, these allegations cannot support the Complaint's tortious interference claim.

However, the Complaint's allegations regarding the Announcement Letter are sufficiently particularized.  Although the Complaint does not state the exact day on which the letter was sent, it is apparent from context that it was sent sometime in November 2018, about a week before the residents switched to the new medical director en masse.   Additionally, the Complaint contains a sufficiently specific description of the Announcement Letter's substance to satisfy Rule 9(b): the letter "announc[ed]" the new Medical Director and noted that the residents had a right to any provider of their choosing.  ECF No. 1 ¶ 162.  The Complaint also alleges that Feick played a role in writing the Announcement Letter, and any other information about the individuals involved in the letter's preparation and transmittal is likely to be in the Defendants' possession.  In short, it is fair to think that, based on these allegations, the Defendants know what letter the Plaintiffs are complaining about; indeed, the Defendants have not asserted that they are actually confused on that point.

The Complaint's allegations about the Announcement Letter satisfy Rule 9(b); the others do not.  I therefore address the Defendants' substantive argument—that the statements are protected by a conditional privilege—with respect only to the statements in the Announcement Letter.

> ### ii.   Substantive Requirement: Knowing or Reckless Disregard for Truth

As both parties observe, Maine courts have not directly addressed whether a conditional privilege may protect statements that are the basis for a tortious

interference claim.[8]   However, even if there is no "privilege" protecting the allegedly tortious statements based on the circumstances in which they were made, in order to make out their tortious interference claim the Plaintiffs must demonstrate that the Defendants interfered "through fraud or intimidation."  *Rutland*, 798 A.2d at 1110. To do so, the Plaintiffs must plead and prove that the Defendants made "(i) a false representation (ii) of a material fact, (iii) with knowledge of its falsity or reckless disregard for whether it is true or false, (iv) for the purpose of inducing another to act in reliance on the representation, and (v) the other justifiably relies to her detriment." *Howell v. Advantage Payroll Servs., Inc.*, No. 2:16-cv-438-NT, 2017 WL 782881, at *6 (D. Me. Feb. 28, 2017) (citing *Rutland*, 2002 ME 98, ¶ 14, 798 A.2d at 1111).  Thus, a tortious interference plaintiff must show that the defendant has made the statement "with knowledge of its falsity or reckless disregard for whether it is true or false." *Id.*

The Complaint's factual allegations about the Announcement Letter fail to meet this standard.  As alleged in the Complaint, the letter notified residents that, despite the arrival of a new medical director, they remained free to choose any medical provider.   However, the Complaint does not contain any additional allegations to indicate that the Announcement Letter, or its failure to acknowledge Dr. Fazeli, was unusual in any way.  In light of the obvious alternative explanation for the letter's failure to mention Dr. Fazeli—that is, that the letter's purpose was to announce the new Medical Director, rather than to explain why Dr. Fazeli was

---

[8] In Maine, unlike in some other states, fraud or intimidation is a necessary element of tortious interference with a present or prospective economic advantage.  *See Rutland*, 2002 ME 98, ¶ 13 n.5, 798 A.2d at 1110 n.5.  Because fraud requires proof of a knowing or reckless misrepresentation—Maine does not recognize negligent tortious interference, *see id.*—there is no need for a conditional privilege, which would not protect false statements made with more than mere negligence.

leaving—it is not plausible that the Defendants knew, or recklessly disregarded the possibility, that that broad statement could be taken to falsely imply that Dr. Fazeli had resigned.

Thus, even though the Complaint's allegations about the Announcement Letter satisfy Rule 9(b)'s particularity requirement, the Complaint fails to plausibly allege that the Defendants made the statements in the letter with knowing or reckless disregard for the truth, as required to state a claim for tortious interference under Maine law.

### 2.   Defamation

#### i.   Pleading Requirement: Sufficient Detail

"Although it is not necessary . . . to plead defamation under the requirements of Rule 9(b), the pleadings in a defamation case need to be sufficiently detailed to the extent necessary to enable the defendant to respond," *Bishop v. Costa*, 495 F. Supp. 2d 139, 141 (D. Me. 2007), and must therefore "assert the substance of the allegedly defamatory statements and the context of the publication," *McDonald v. Verso Paper LLC*, No. 1:15-cv-00229-JDL, 2015 WL 5993875, at *2 (D. Me. Sept. 22, 2015) (*rec. dec., aff'd* Oct. 14, 2015).  For instance, if a complaint does not specify "to whom the statements were allegedly made, the method of publication, or any information that provides insight as to when the statements were allegedly made," it cannot support a defamation claim.  *Beaney v. Univ. of Me. Sys.*, No. 2:16-cv-00544-JDL, 2017 WL 782882, at *6 (D. Me. Feb. 28, 2017).

In this case, the defamation pleading standard applies to the Complaint's allegations in exactly the same way as the Rule 9(b) pleading standard.  Thus, for the

same reasons I have previously explained, the allegations regarding the Announcement Letter are adequate, but the other allegations are not.

### ii.  Substantive Requirement: Unprivileged Publication

A defamation claim under Maine law requires that the defendant has made "an unprivileged publication to a third party." *Morgan v. Kooistra*, 2008 ME 26, ¶ 26, 941 A.2d 447, 455 (quoting *Rice v. Alley*, 2002 ME 43, ¶ 19, 791 A.2d 932, 936). "A conditional privilege protects against liability for defamation when 'society has an interest in promoting free, but not absolutely unfettered, speech.'" *Id.* (quoting *Cole v. Chandler*, 2000 ME 104, ¶ 6, 752 A.2d 1189, 1193). To determine whether a publication is privileged, Maine "uses a weighing approach based on the totality of the circumstances, in view of the interests of the publisher and the recipient," *Lester v. Powers*, 596 A.2d 65, 70 (Me. 1991) (citing Restatement (Second) of Torts §§ 594-598 (Am. Law Inst. 1977)). "Any situation in which an important interest of the recipient will be furthered by frank communication may give rise to a conditional privilege." *Id.*

The allegedly tortious statements here were published in a context "in which an important interest of the recipient [would] be furthered by frank communication." *Id.* The Announcement Letter was sent to residents of geriatric care facilities and discussed the provision of medical care at those facilities. The residents plainly had an interest in obtaining information about their medical care. What's more, society has an interest in promoting open discussion about the quality and administration of geriatric care. The publication of the letter is therefore conditionally privileged against the Plaintiffs' defamation claim.

26

However, under Maine law, the conditional privilege for defamation is not a blanket immunity from suit: rather, the privilege does not protect a defendant who "knows his statement to be false, recklessly disregards its truth or falsity, or acts with spite or ill will." *Cole*, 2000 ME 104, ¶ 7, 752 A.2d at 1194 (internal quotation marks omitted).

Thus, the Complaint cannot state a claim for defamation based on the statements in the Announcement Letter if it does not plausibly allege that the statements were made with knowing or reckless disregard for their truth or falsity. For purposes of the present motion, this element is substantively identical to the fraud element of the Plaintiffs' tortious-interference claim, and I have already determined that the Complaint does not plausibly allege that the statements in the Announcement Letter were made with knowing or reckless disregard for their truth. Thus, the Complaint fails to state a claim for defamation, because the letter was conditionally privileged and the Complaint does not plausibly allege that the Defendants abused the privilege.

### 3.   Proposed Amendment

Having determined that the Plaintiffs' Complaint does not state a claim for tortious interference or defamation, I turn to whether the additional allegations in the proposed amended complaint would change this result.  The proposed additions describe statements that the Defendants allegedly made in October 2018 to an individual whose mother was a resident at Avita of Stroudwater, regarding Dr. Fazeli's ability to continue providing individual services to her mother.  The proposed amended complaint alleges that the daughter "wanted to retain [Dr. Fazeli] as her

27

mother's physician," ECF No. 24-1 ¶ 166, but "was told by Avita of Stroudwater staff that if she wanted Dr. Fazeli to continue to be her mother's doctor, she would need to take her mother to appointments at his office in Biddeford and that Dr. Fazeli would not be able to come [to Avita of Stroudwater]," *id.* ¶ 167. Specifically, the daughter "was informed by either Wendy the LPN or [DeMatteo] that she would need to transport her mother to Dr. Fazeli's office for appointments." *Id.* ¶ 168. The proposed amended complaint also alleges that the daughter "was given a form asking her authorization to switch her mother's care to the new doctor." *Id.* ¶ 165.

As I have previously mentioned, the Defendants oppose amendment solely on the grounds that the proposed amended complaint does not state a claim for tortious interference or defamation. Neither party suggests that the additional allegations implicate any different standards or concepts than those raised by the Plaintiffs' extant tortious-interference and defamation claims. I therefore apply the law, as I have explained it, to these new allegations.

### i.   **Tortious Interference**

Applying the pleading standard I have already explained, the Plaintiffs' proposed additions to the Complaint meet the particularity standard of Rule 9(b). As with the Announcement Letter, the proposed amendments do not specify the day on which the statement was made, but nor do they provide an overly broad range of dates; rather, the Plaintiffs allege that the events occurred in "October 2018." ECF No. 24-1 ¶ 164. The Defendants also argue that the proposed amendment's failure to specify which of two persons made the allegedly false statement—DeMatteo, or "Wendy the LPN"—means that the allegations are insufficiently particularized.

However, the substance of the alleged misrepresentation—that the daughter would need to transport her mother to Dr. Fazeli's office—is sufficiently detailed to "enable [the Defendants] to prepare meaningful responses" and satisfy the Court that the claims are not frivolous. *Dumont*, 934 F.3d at 39. And the Plaintiffs have whittled the statement's maker down to two specific persons, both of whom were allegedly employed by the Defendants at the time; it could not take much investigation for the Plaintiffs to identify which of these two individuals communicated with the resident's daughter about Dr. Fazeli's ability to provide care on site. In short, these are not the broad, catchall allegations of fraud that Rule 9(b) is intended to screen out, and the proposed amended complaint therefore satisfies Rule 9(b).

Turning to the substantive requirements I also outlined above, I conclude that the proposed amended complaint is sufficient to plausibly allege that the Defendants made these statements with knowing or reckless disregard for the truth. Unlike the allegations about the Announcement Letter, there is no obvious alternative explanation for the alleged misstatement about Dr. Fazeli's ability to provide care at the facility. Additionally, it is perfectly likely that staff at an assisted living facility would have some knowledge about the provision of on-site medical care. The proposed amended complaint therefore plausibly states a claim that the statement was made with knowing or reckless disregard for its truth. *See Howell*, 2017 WL 782881, at *6.

Finally, the Defendants suggest that the proposed amended complaint does not state a tortious-interference claim because, according to the Defendants, the proposed amended complaint "does not allege that the patient herself wished to retain Fazeli or that the daughter had legal control over decisions related to her mother's care."

ECF No. 25 at 3.  The Defendants do not explain the relevance of this assertion, but I presume that this is a challenge to the element of causation required for a tortious-interference claim—i.e., that if the daughter had no control over the decision, a statement made to her could not have proximately caused damages. *See Howell*, 2017 WL 782881, at *6.  But regardless of the strength of this legal argument, the Defendants' characterization of the Plaintiffs' allegations is incorrect: the proposed amended complaint also alleges that the daughter "was given a form asking for her authorization to switch her mother's care to the new doctor," ECF No. 24-1 ¶ 165, and that "[i]f [the daughter] had been given the option of continuing to have Dr. Fazeli treat her mother at Avita of Stroudwater, she would have done so," *id.* ¶ 171.  These assertions are more than sufficient to plausibly allege a causal connection between the statement and the Plaintiffs' alleged injury.

Therefore, the Plaintiffs' proposed amended complaint states a claim for tortious interference.

### ii. Defamation

As I have previously explained, although the Plaintiffs' defamation claim is not subject to Rule 9(b), the allegations underlying that claim must "be sufficiently detailed to the extent necessary to enable the defendant to respond." *Bishop*, 495 F. Supp. 2d at 141.  And again, for precisely the same reasons that the proposed amended complaint satisfies Rule 9(b), it meets this pleading standard: although the proposed amended complaint does not assert with absolute specificity the time and maker of the statement regarding Dr. Fazeli's ability to provide on-site care, the

allegations are concrete and detailed enough to allow the Defendants to readily prepare a response.

My analysis of the merits also echoes that of the tortious interference claim. Again, the only ground on which the Defendants have challenged the Plaintiffs' defamation claim is that the Complaint fails to allege an "unprivileged publication" of the allegedly defamatory statement.[9]  *Morgan*, 2008 ME 26, ¶ 26, 941 A.2d 447, 455 (quoting *Rice*, 2002 ME 43, ¶ 19, 791 A.2d 932, 936).  The statement described in the proposed amended complaint, like those in the original Complaint, was allegedly made by an employee of an assisted living facility regarding the provision of medical care to a resident there; like the statements in the original Complaint, it is therefore protected by a conditional privilege.  However, unlike the original Complaint, the proposed amended complaint plausibly alleges that the statement was made with knowing or reckless disregard for its truth, and that the conditional privilege was therefore abused.  The reasons for this are identical to the reasons that I concluded that the proposed amended complaint sufficiently states a claim for tortious interference, as explained above.

In sum: The original Complaint fails to state a claim for either tortious interference or defamation.  However, the proposed amended complaint corrects the deficiencies as to both claims.  Accordingly, leave to amend is proper, and the Defendants' motion to dismiss is denied as to these claims in the amended complaint.

---

[9] The Defendants have not argued that the statement about Dr. Fazeli's ability to provide on-site medical services to individual residents did not constitute defamatory material.  *See Franchini v. Bangor Publ'g Co.*, 383 F. Supp. 3d 50, 60 (D. Me. 2019) ("Generally, 'a communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" (alteration omitted) (quoting *Bakal v. Weare*, 583 A.2d 1028, 1029 (Me. 1990)).

## IV.  CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Leave to File First Amended Complaint (ECF No. 24) is **GRANTED**, and the Defendants' Motion to Dismiss (ECF No. 7) is **DENIED**.

**SO ORDERED.**

**Dated this 4th day of May, 2021**

_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**