## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **JABBAR FAZELI, MD, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **2:20-cv-00350-JDL** |
| | ) | |
| | ) | |
| **NORTHBRIDGE STROUDWATER** | ) | |
| **LODGE II LLC et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Jabbar Fazeli, MD, and Maine Geriatrics, LLC, initiated this case against nine Defendants. The case arises out of the termination of Plaintiffs' contracts to provide medical services at independent, assisted living, and memory care facilities owned or operated by Defendants. In the Second Amended Complaint (ECF No. 49),[1] filed on November 9, 2021, Plaintiffs allege four claims: (1) violation of 42 U.S.C.A. § 1981 (West 2023) (Count I); (2) violation of the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. §§ 831-840 (West 2023) (Count II); (3) defamation (Count III); and (4) tortious interference (Count IV).[2]

---

[1] The Court granted Plaintiffs leave to amend their complaint twice, first to substantively amend the claims for tortious interference and defamation (ECF No. 29) and then to substitute Defendant Stafford Management Company for "Northbridge Companies" (ECF No. 49).

[2] Although the Second Amended Complaint mentions a breach of contract claim in passing Plaintiffs neither develops that claim further, nor include it in the Prayer for Relief. Accordingly, I deem the claim waived. *See, e.g., Donovan v. Office of Dist. Attorney*, No. 1:12-cv-00077-MJK, 2013 WL 71805, at *7 (D. Me. Jan. 4, 2013).

Dr. Jabbar Fazeli is a medical doctor who practices through Maine Geriatrics, LLC, a Maine limited liability company of which he is the sole member.  Although each Plaintiff has separate legal standing and claims, I refer to them collectively as "Fazeli" throughout this Order for the sake of clarity, and I refer to them individually as "Dr. Fazeli" and "Maine Geriatrics" as context requires.

This Order also adopts shorthand references for the nine Defendants—seven business entities referred to collectively as the "Defendant Entities" and two individuals referred to together as the "Individual Defendants"—for clarity and ease of reading.  The table below sorts the Defendant Entities into two subgroups, one for the three "Original Facilities" and another for the corresponding "Recapitalized Facilities." The remaining Defendant Entity, Stafford Management Company, employs the personnel who administered or administer those facilities.  The table also provides the abbreviated name used for each defendant throughout this Order.

| DEFENDANT'S NAME IN PLEADINGS | ABBREVIATED NAME |
|---|---|
| **Group 1: The "Defendant Entities"** | |
| Stafford Management Company | "Stafford" |
| *- Subgroup A: The "Original Facilities"* | |
| (i)   Northbridge Stroudwater Assisted Living, LLC d/b/a Stroudwater Lodge | "Stroudwater Lodge" |
| (ii)   Avita Stroudwater, LLC d/b/a Avita of Stroudwater | "Avita of Stroudwater" |
| (iii)   Avita Wells, LLC d/b/a Avita of Wells | "Avita of Wells" |
| *- Subgroup B: The "Recapitalized Facilities"* | |
| (i)   Northbridge Stroudwater Lodge II, LLC | "Stroudwater Lodge II" |
| (ii)   Northbridge Avita Stroudwater II, LLC | "Avita of Stroudwater II" |
| (iii)   Northbridge Avita Wells II, LLC | "Avita of Wells II" |
| **Group 2: The "Individual Defendants"** | |
| Katrin Feick | "Feick" |
| Orlene DeMatteo | "DeMatteo" |

All Defendant Entities have some relationship with a non-party, NBR Company, LLC d/b/a Northbridge Companies ("Northbridge Company"), the details of which are discussed as relevant to the issues presented.  Each Recapitalized Facility reflects a group of investors that purchased the real estate and going business affairs from the investor-owners of the Original Facilities.

On October 14, 2022, Defendants moved for summary judgment (ECF No. 79) on the merits as to all counts alleged in the Second Amended Complaint.  Failing that, Defendants also seek summary judgment as to the Recapitalized Facilities for lack of evidence that the Recapitalized Facilities assumed the Original Facilities' liabilities.  On November 29, 2022, Fazeli moved for partial summary judgment (ECF No. 87) solely on the issue of whether the Defendant Entities are an "integrated enterprise."  ECF No. 87 at 1.  The parties filed a stipulated summary judgment record (ECF No. 76) and their respective motions have been fully briefed.[3]

## I. THE SUMMARY JUDGMENT RECORD

Local Rule 56 supplements Federal Rule of Civil Procedure 56 in governing summary judgment practice in the District of Maine.  Under Subsection (h) of Local Rule 56, the parties to a dispute must jointly propose a briefing schedule for all summary judgment motions. D. Me. Local R. 56(h)(1).  The briefing schedule, which the court may adopt, modify, or discuss further at a pre-filing conference, must

---

[3]  In addition to the responses and replies afforded to the parties by Local Rule 56, Fazeli filed a Sur-Reply (ECF No. 104) to Defendants' Motion for Summary Judgment as well as a separate Response (ECF No. 102) objecting to the requests to strike embedded in Defendants' responses to Fazeli's Additional Statements of Material Facts (ECF No. 98).

include an "estimated number of additional statements by any party opposing the motion for summary judgment." *Id.*

After discussion with counsel at the Local Rule 56(h) conference held on August 18, 2022, this court imposed an 80-paragraph limit on additional statements in its Order and Report of Conference (ECF No. 72).   Nonetheless, Fazeli filed an additional statement of material facts consisting of 507 paragraphs without seeking leave of court to enlarge his response.  Defendants responded to all 507 paragraphs without objecting to the filing for having violated the court's Order and Report.  Still, given Fazeli's significant noncompliance, I accept all of Defendants' substantive denials and qualifications of the additional statement of material facts without further consideration—but solely for the purpose of analyzing Defendants' Motion for Summary Judgment.[4]   Those substantive denials and qualifications do not include Defendants' responses that raise evidentiary objections, which I consider individually.

Fazeli's Response to Defendants' Statement of Material Facts is also noncompliant with Local Rule 56 in two other important respects and with additional consequences.  First, many—if not most—of the responses fail to simply admit, deny, or qualify the asserted material fact, with citation to the relevant portion(s) of the record, as the Local Rule requires.  *See* D. Me. Local R. 56(c) ("The opposing statement

---

[4]  Paragraphs 457-495 and 499-508 of Fazeli's additional statement of material facts asserted in opposition to Defendants' Motion for Summary Judgment are near identical to, though in different order than, paragraphs 2-4, 6-48, and 83-86 of the facts Fazeli asserts in support of his Motion for Partial Summary Judgment.  Because Fazeli properly asserted those facts in support of his motion, I have considered the merits of each of Defendants' qualifications and denials in that separate context. *See infra* Part IV.

shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by" Local Rule 56(f).). Local Rule 56(c) does not invite or permit a party admitting, denying, or qualifying a statement of material fact to launch into a narrative rebuttal of the asserted material fact.   Second, Local Rule 56(c) requires a party opposing summary judgment to "submit with its opposition a separate, *short, and concise* statement of material facts." D. Me. Local R. 56(c) (emphasis added).   Responses that exceed the scope of the movant's asserted facts "should be presented separately as . . . additional facts, in accord with Local Rule 56(c)."   *Michaud v. Calais Reg'l Hosp.*, No. 1:15-cv-359-NT, 2017 WL 902133, at *1 n.1 (D. Me. Mar. 7, 2017).   Fazeli's responses stray from these requirements in several ways.

First, more than half of Fazeli's twenty denials are prolix responses that go far beyond the scope of the Defendants' corresponding factual assertion.   Those denials are not only long—some running as many as four to six pages—but are often argumentative and raise credibility issues that the court cannot resolve at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . .").   Fazeli should have only asserted additional facts in his additional statement of facts, not in his responses to Defendants' statements of material fact.   There is nothing in the Local Rule to suggest that when opposing a

concise and properly supported statement of material fact, the responding party has license to buttress its response with pages of argument.

Given Fazeli's significant noncompliance with Local Rule 56's requirements, I deem paragraphs 37, 42-46, 50, 52, 58, and 59 in Defendants' Statement of Material Facts admitted for purposes of Defendants' motion because Fazeli failed to properly controvert them. *See* D. Me. Local R. 56(f) ("Facts contained in a supporting . . . statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."); *see, e.g.*, *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 7-8 (1st Cir. 2007) (affirming district court's deeming of summary judgment movant's statement of facts "unopposed" and crediting the factual assertions therein in light of nonmovant's "significant noncompliance" with the trial court's Local Rule 56).

For their part, Defendants put forward two statements of material fact that do not fully comply with the requirements of Local Rule 56(f) and which I disregard. First, in paragraph 27 of Defendants' Statement of Material Facts, Defendants assert that their staff would, "when prompted by patients' family, convey to [Dr.] Fazeli the family's desire to explore additional medications to address their loved one's behavior," citing a page from the deposition transcript of former Avita of Stroudwater Resident Care Director Jean Pecorelli in support. ECF No. 98 at 7, ¶ 27. However, the cited excerpt does not substantiate Defendants' assertion; indeed, it evidences only that Pecorelli did not "like the way [the] question" of whether she "communicate[d] to the family that there [was] more that Dr. Fazeli could be doing

for the resident" had been asked.   ECF No. 76-7, 81:20-22 (Pecorelli deposition).
Accordingly, that fact is not properly supported, and I disregard it.

Defendants assert a second fact not properly before me in paragraph 32 of their
statement of material facts.   That paragraph, which asserts that two of the Original
Facilities terminated Fazeli's contracts "due to specific concerns with [Dr.] Fazeli
unrelated to race," contains a legal conclusion on an ultimate issue central to Fazeli's
Section 1981 claim, which I therefore disregard.   ECF No. 98 at 9, ¶ 32; *see, e.g.,*
*Burnett v. Ocean Props., Ltd.*, 327 F. Supp. 3d 198, 206 n.9 (D. Me. 2018).

## II.  FACTUAL BACKGROUND

The following material facts were properly presented and supported and are
undisputed unless otherwise noted:

### A.   The Parties

Dr. Fazeli is an Iranian-born Muslim Arab.   Dr. Fazeli is the sole member of
Maine Geriatrics, a Maine company through which Dr. Fazeli has provided medical
services at several facilities in Maine since 2003.   Dr. Fazeli became the attending
physician at Avita of Stroudwater in 2013.   On March 1, 2015, Maine Geriatrics and
Avita of Stroudwater entered into a medical services contract, at which point Dr.
Fazeli became that facility's medical director.   Maine Geriatrics signed medical
services contracts with Avita of Wells and Stroudwater Lodge on April 25, 2016.   Dr.
Fazeli drafted each of the contracts between Maine Geriatrics and the Original
Facilities.   Under those contracts, Maine Geriatrics would provide (1) "Onsite visits
by NPs (minimum once a week) with MD back up," (2) "Coordination of care," and (3)
"24/7 call coverage."   ECF No. 98 at 70-71, ¶ 73.   The contracts also outlined Dr.

Fazeli's individual responsibilities, among them conducting "[w]eekly wound rounds," "[g]eriatric consultation on dementia patients with behavioral disturbances,"[5] "[t]eam building and onsite staff education around dementia care," "[c]onsultations on cases for Polypharmacy," and "[p]romoting Antipsychotic reductions."  ECF No. 98 at 71, ¶ 74.  Although Dr. Fazeli served as medical director at the Original Facilities, facility residents could choose their own medical provider.  The contracts provided that they were terminable at will by either party.

Each of the Original Facilities was a single-purpose entity led by an Executive Director and a Resident Care Director (RCD) including, among others: Katrin Feick[6] and Orlene DeMatteo[7] at Avita of Stroudwater, Courtney Freeman and Tracy Hoppe at Stroudwater Lodge, and Nichole Doyer and Rosanna Renadette at Avita of Wells. The Recapitalized Facilities, which are also single-purpose entities, are owned by the limited liability companies that purchased the Original Facilities' assets, namely their real estate and ongoing business affairs.

Though not a party to this dispute, Northbridge Company is a property developer that featured prominently in the Defendant Entities' dealings because it courted investor groups to fund the Original Facilities and, later, to purchase (*i.e.*, "recapitalize") those facilities from the initial investors.  ECF No. 98 at 172, ¶ 484.

---

[5] The parties agree that a geriatric consultation is "a review of an elderly person's care to address geriatric specific issues, including dementia, fall prevention, medication management, caregiving, personal care attendants, and care facility placement."  ECF No. 98 at 72, ¶ 79.

[6] Feick began working at Avita of Stroudwater on December 1, 2017.

[7] Jean Pecorelli was RCD at Avita of Stroudwater from 2016 to 2018.  DeMatteo became RCD at Avita of Stroudwater after Pecorelli.

Northbridge Company also operated or operates the Original and Recapitalized Facilities through a subsidiary, Northbridge Senior Housing, in exchange for a management fee. Northbridge Company CEO John Coughlin and President Wendy Nowokunski are shareholders in Defendant Stafford, which hires, deploys, and pays personnel to administer the Defendant Facilities. In addition to facility-specific personnel, Stafford employed Senior Vice President of Operations Shawn Bertram and Regional Director of Clinical Services Marcia Suddy.

## B.   Fazeli's Termination

On October 2, 2018, Defendants gave Fazeli 60 days' notice that the medical service contracts with the Original Facilities were being terminated. More than two years earlier, on August 17, 2016, the *Bangor Daily News* ("BDN") published an article reporting that Dr. Fazeli's brother had been a terrorist fighter in the Islamic State of Iraq and Syria. At least one Stafford employee, Stroudwater Lodge Executive Director Freeman, read the article.

In the period leading up to the termination notices that were given on October 2, 2018, multiple Stafford employees made complaints about Dr. Fazeli's performance, alleging that he failed to provide routine and meaningful contact with patients, refused to engage with patients' families, and was demeaning or dismissive in his treatment of coworkers, especially nurses. Dr. Fazeli voiced his own concerns during this period, including to report that a Stafford employee was interfering with the care plan of the employee's mother, an Avita of Stroudwater resident. Fazeli first reported the incident to DeMatteo and later to a state ombudsman when DeMatteo failed to act. Dr. Fazeli also reported concerns to Stafford employees about the

9

adequacy of Defendants' protocols for collecting vaccine information and efforts by some Stafford employees to obtain antipsychotic medications for residents against his orders.

The parties dispute the reasons for Fazeli's termination and the related events that occurred thereafter.  Fazeli casts the termination as Defendants' racial and retaliatory animus made manifest—the former aroused by the BDN article and the latter in response to Dr. Fazeli having made reports of allegedly unsafe, illegal, and/or substandard workplace practices.   In contrast, Defendants attribute their termination decision to "legitimate" reasons, ECF No. 98 at 45, ¶ 58, including Dr. Fazeli's contractual breaches, his hostile and demeaning conduct toward coworkers, and a "breakdown in communications," ECF No. 98 at 51, ¶ 59.  The parties also disagree about whether a Stafford employee, either DeMatteo or another nurse at Avita of Stroudwater identified in the summary judgment record only as "Wendy the LPN" told a resident's relative that, after his contract termination, Dr. Fazeli would only be available to provide care for the resident offsite and not at the facility.  ECF No. 98 at 155, ¶ 433.[8]

---

[8]  The parties dispute whether the evidence supporting this and other related statements of material fact—Saunders' affidavit—is properly included in the summary judgment record.  In his Initial Disclosures, Fazeli identified Saunders and disclosed her relevant knowledge, including information pertaining to "communications from staff of Defendant facilities regarding the termination of Plaintiffs' [sic] as medical directors and the options for retaining Plaintiffs as her mother's physician." ECF No. 97-2 at 3.  That disclosure complies with Fed. R. Civ. P. 26(a)(i), and Fazeli had no duty to supplement it by producing Saunders' affidavit to flesh out the details of the narrowly identified areas of her relevant knowledge.  *See* Fed. R. Civ. P. 26(e)(1) (requiring a party to "supplement or correct" a disclosure made under Rule 26 only where that "party learns that in some material respect the disclosure . . . is incomplete or incorrect"); *see, e.g.*, *Omori v. Brandeis Univ.*, No. 20-11021-NMG, 2022 WL 10480076, at *1 (D. Mass. Oct. 18, 2022).

## III.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'An issue is "genuine" if it can "be resolved in favor of either party," and a fact is "material" if it "has the potential of affecting the outcome of the case."'" *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quoting *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016)). A defendant moving for summary judgment can prevail by either "affirmatively produc[ing] evidence that negates an essential element of the non-moving party's claim," or "demonstrat[ing] that the non-moving party will be unable to carry its burden of persuasion at trial" based on the record evidence. *Ocasio-Hernández v. Fortuño-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) (quoting *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000)).

"[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel,* 260 F.3d 27, 31 (1st Cir. 2001) (quoting *In re Menna*, 16 F.3d 7, 9 (1st Cir. 1994)). It follows that, to withstand summary judgment, the nonmovant must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). "This is no less true in discrimination and retaliation cases where motive is at issue; a nonmovant cannot rely 'merely upon conclusory allegations, improbable inferences,

and unsupported speculation.'" *Pina v. Children's Place*, 740 F.3d 785, 796 (1st Cir. 2014) (quoting *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 855-56 (1st Cir. 2008)).

In deciding summary judgment motions, the court construes the record and all reasonable inferences therefrom in the light most favorable to the nonmovant. *Braga v. Genlyte Grp., Inc.*, 420 F.3d 35, 38 (1st Cir. 2005). That approach does not, however, require the court "to draw unreasonable inferences or credit bald assertions [or] empty conclusions." *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (quoting *Cabán Hernández*, 486 F.3d at 8). Still, courts "exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000); *cf. Mulero-Rodríguez v. Ponte, Inc.*, 98 F.3d 670, 677 (1st Cir. 1996) ("[D]eterminations of motive and intent, particularly in discrimination cases, are questions better suited for the jury." (quoting *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 34 (1st Cir. 1990))).

When opposing parties move for summary judgment, the "court must consider each motion separately, drawing inferences against each movant in turn." *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir. 1996) (quotation marks omitted). I first address Fazeli's Motion for Partial Summary Judgment on the discrete integrated enterprise issue and then turn to Defendants' Motion for Summary Judgment on all of Fazeli's claims. For the following reasons, I deny Fazeli's motion and grant some facets of Defendants' motion while denying others.

## IV.   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Fazeli seeks summary judgment on a single issue: whether the Defendant Entities are an integrated enterprise—the upshot being that each of the Defendant Entities should be liable for all claims.  Defendants respond with an emphatic "no," contending that Fazeli has not offered facts to support even one of the four factors that comprise the controlling integrated enterprise test.  Given the competing evidence and genuine issues of material fact, I conclude that the integrated enterprise question must be left for a jury to decide.

Under the integrated enterprise test, courts consider four factors when deciding whether multiple entities are a single employer: (1) centralized control over labor relations; (2) interrelation of operations; (3) common management; and (4) common ownership.  *Torres-Negrón v. Merck & Co., Inc.*, 488 F.3d 34, 42 (1st Cir. 2007).  "Not all four factors are necessary to establish a single employer relationship. 'Rather, the test should be applied flexibly, placing special emphasis on the control of employment decisions.'"  *Burnett v. Ocean Props., Ltd.*, 987 F.3d 57, 65 (1st Cir. 2021) (internal citation omitted) (quoting *Torres-Negrón*, 488 F.3d at 42)).  In this context, "control of employment decisions" and "centralized control of labor relations" are interchangeable.  *See id.* ("[C]ontrol over labor relations . . . examines control of employment decisions"); *Romano v. U-Haul Int'l*, 233 F.3d 655, 666 (1st Cir. 2000) ("control of labor operations i.e., control of employment decisions").

On the one hand, several factors favor concluding that the Defendant Entities are an integrated enterprise.  As to centralized control of labor relations—the integrated enterprise test's "primary consideration," *Romano*, 233 F.3d at 666—

Defendants concede that firing decisions generally would be "reviewed by [Stafford] 'employees at the corporate office.'"  ECF No. 93 at 15, ¶ 58 (response) (quoting Bertram's deposition).  There is also evidence of interrelated operations and common management among the Defendant Entities.  Northbridge Senior Housing, a Northbridge Company subsidiary, operated or operates all Defendant Entities. Stafford employees administered or administer all the Original and Recapitalized Facilities.  Feick, Freeman, and Doyer, Executive Directors at the Original Facilities, each acknowledge the existence of a nebulous "home office" that, in this idiosyncratic arrangement of business entities, hovers in the liminal space between Northbridge Company and the Original and Recapitalized Facilities.  Feick and Doyer reported complaints about Fazeli to Bertram and Suddy in that home office.

On the other hand, there is evidence suggesting that the Defendant Entities are not integrated.  Most compelling is Fazeli's admission that Executive Directors at the Original Facilities "could make their own hiring decisions," thus evidencing some decentralized control over employment decisions.  ECF No. 93 at 14, ¶ 55. Additionally, the Original and Recapitalized Facilities are single-purpose entities, which cuts against finding common ownership.

Considered in total, the undisputed material facts neither require finding that the Defendant Entities are an integrated enterprise nor foreclose that conclusion.  A jury balancing the relevant factors could reasonably reach either outcome, which precludes summary judgment for Fazeli.  In any event, Fazeli is not entitled to summary judgment because the parties genuinely dispute two facts material to the

integrated enterprise issue: (1) whether Executive Directors at the Original Facilities could make termination decisions without home office oversight, *see* ECF No. 93 at 16, ¶¶ 60-61, and (2) whether Northbridge Company maintains an ownership stake in the Recapitalized Facilities.

## V.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all of Fazeli's claims and, alternatively, as to the claims against the Recapitalized Facilities.   In support, Defendants argue that: (1) Plaintiffs cannot establish essential elements of their Section 1981 and MWPA claims; (2) Defendants' allegedly tortious statement is not, as a matter of law, defamatory; and (3) Defendants did not knowingly or recklessly mislead a resident's relative about Dr. Fazeli's on-site availability at Avita of Stroudwater after his contract termination.   As to the Recapitalized Facilities, Defendants contend that there is no evidence either tying them to "any tortious act alleged in the Complaint or demonstrat[ing] that [they] have taken on the liability of their co-Defendants."   ECF No. 79-1 at 4.   I address the liability of the Recapitalized Facilities first before proceeding to Defendants' arguments as to Fazeli's claims.

## A.   Liability of the Recapitalized Facilities

The Recapitalized Facilities are not entitled to summary judgment. Defendants' motion includes a brief argument that the Recapitalized Facilities bear no liability for Fazeli's claims exclusively as a matter of fact, without citing to any authority, controlling or otherwise, in support.   Defendants eventually assert relevant legal arguments, but only to oppose Fazeli's motion on the integrated-enterprise question.   Defendants' Reply Motion (ECF No. 97) incorporates

those arguments by reference to support their motion for summary judgment as to the Recapitalized Facilities without further elaboration. Accordingly, I deny summary judgment for the Recapitalized Facilities because their repurposed successor-liability arguments, born in opposition to Fazeli's motion, do not establish either the absence of any genuine issues of material facts or their entitlement to judgment as a matter of law.

## B.   Count I – Violation of 42 U.S.C.A. § 1981

Defendants are not entitled to summary judgment on Fazeli's Section 1981 claim because there are sufficient disputes of material fact regarding pretext such that a jury could reasonably find Defendants' decision to terminate Fazeli was motivated, at least in part, by discriminatory animus.

Section 1981 safeguards the right of "[a]ll persons . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C.A. § 1981(a). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). In effect, Section 1981 forbids racial discrimination in the making of private and public contracts. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987).

"To state a claim under [Section] 1981, a plaintiff must show that (1) she is a member of a racial minority; (2) the defendant discriminated against her on the basis

16

of her race; and (3) the discrimination implicated one or more of the activities listed in the statute, including the right to make and enforce contracts." *Hammond v. Kmart Corp.*, 733 F.3d 360, 362 (1st Cir. 2013). Additionally, a Section 1981 plaintiff must "plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. __, 140 S. Ct. 1009, 1019 (2020).

Where, as here, a plaintiff opposing summary judgment does not have direct evidence of discrimination, courts apply the *McDonnell Douglas* burden-shifting framework to analyze Section 1981 claims. *Joseph v. Lincare, Inc.*, 989 F.3d 147, 157 (1st Cir. 2021); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Under this framework, the plaintiff first has the burden to establish a *prima facie* case by showing: "1) she was a member of a protected class, 2) she was qualified for her position, 3) she was subjected to an adverse employment action, and 4) the position remained open or was filled by someone with similar qualifications." *Pina*, 740 F.3d at 796. Such a showing establishes a rebuttable presumption that the employer engaged in discrimination. *Id.* The accused employer can rebut that presumption by articulating "'a legitimate, non-discriminatory reason for its adverse employment action' by identifying enough admissible evidence to 'support a [rational] finding that unlawful discrimination was not the cause of the employment action.'" *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001) (alteration in original) (internal citations omitted) (first quoting *Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 19 (1st Cir. 1999); then quoting *Feliciano de la Cruz v. El*

*Conquistador Resort & Country Club*, 218 F.3d 1, 5-6 (1st Cir. 2000)).  Should the defendant employer meet its burden, the burden shifts back to the plaintiff to produce "evidence that the defendant's explanation is pretextual and that discriminatory animus prompted the adverse action." *Pina*, 740 F.3d at 796.  Conclusory allegations, improbable inferences, and unsupported speculation are insufficient to show discriminatory animus. *Feliciano de la Cruz*, 218 F.3d at 5.

Defendants argue that Fazeli cannot establish but-for causation on the Section 1981 claim because Stafford employees provided "legitimate business reasons unrelated to race" to explain why Fazeli's contracts were terminated.  ECF No. 79-1 at 4.  These reasons include "a breakdown in communications, [Dr.] Fazeli's hostility toward nurses, lack of attention to concerns of patients' families, and other legitimate clinical or business motivations."  ECF No. 79-1 at 5.  Defendants also contend that the BDN article was published too long before Defendants terminated Fazeli's contracts for there to be any causal connection between the two events.

It is apparent from the record that (1) Fazeli has produced sufficient evidence to establish a *prima facie* case under Section 1981, and (2) Defendants have rebutted the presumption of discrimination by articulating non-discriminatory reasons for terminating Fazeli's contracts.  Therefore, my analysis focuses on whether Fazeli has offered competent evidence that the Defendants' justifications are pretextual.  I conclude that the evidence of pretext is sufficient to deny Defendants' summary judgment on the Section 1981 claim.

Fazeli's theory of race-based discrimination, allegedly prompted by publication of the BDN article about his brother, is somewhat attenuated, especially relative to the substantial evidence supporting Defendants' proffered non-discriminatory reasons for terminating Fazeli.  But courts assessing a summary judgment record "should be mindful that what might initially appear to be a weak case of pretext is not the same as no case" because "reasonable jurors can and often do disagree as to both the weight and meaning of evidence." *Lennan v. Healthcare Servs. Grp., Inc.*, No. 2:20-cv-00057-GZS, 2022 WL 504113, at *12 (D. Me. Feb. 17, 2022) (quoting *Trott v. H.D. Goodall Hosp.*, 2013 ME 33, ¶ 20, 66 A.3d 7).

As to pretext, the statements of material fact reference an email in which a Stafford employee, Regional Director of Clinical Services Suddy, called Dr. Fazeli "an evil man," ECF No. 98 at 134, ¶ 359, as well as Suddy's testimony qualifying that remark as reflecting her feelings about Dr. Fazeli's allegedly disrespectful treatment of a co-worker based on her sexual orientation, ECF No. 98 at 134, ¶ 360.  Those statements, however sincere, must be considered in conjunction with the fact that Defendants have not offered any additional evidence to corroborate the allegation that Dr. Fazeli mistreated a co-worker based on the co-worker's sexual orientation. Doyer, who purportedly told Suddy about the incident, flatly denied that the alleged victim ever indicated that Dr. Fazeli discriminated against her because of her sexual orientation.  The victim herself denied that Dr. Fazeli had ever said anything harassing or disrespectful to her.  And, undoubtedly, "evil" is a particularly loaded term when used to describe a Muslim American, like Dr. Fazeli, in view of recent

American history, including the War in Iraq and the United States's fraught relations with Iran, Dr. Fazeli's birthplace. *See* President George W. Bush, State of the Union Address at the United States Capitol (Jan. 29, 2002) (transcript available at https://georgewbush-whitehouse.archives.gov/news/releases/2002/01/20020129-11.html (identifying Iran as one of several countries "constitut[ing] an axis of evil")). Because Suddy was involved in the discussions that culminated in the termination decision, the contradictory evidence surrounding her justification for calling Dr. Fazeli "evil"—what she alleges was disrespectful treatment of a co-worker and the co-worker's denial of the same—is sufficient evidence of pretext for Fazeli to survive summary judgment on the Section 1981 claim.

Defendants' passing argument that a lack of temporal proximity undercuts Fazeli's *prima facie* showing—*i.e.*, the termination decision occurred too long after the BDN article was published for there to be a causal connection between them—is unpersuasive. The "absence of a close temporal relationship" between operative events does not necessarily dictate the outcome of summary judgment. *See Murphy v. U.S. Dep't of Veterans Affs.*, No. 1:12-cv-379-DBH, 2013 WL 4508346, at *6 (D. Me. Aug. 23, 2013) (quoting *Osher v. Univ. of Maine Sys.*, 703 F. Supp. 2d 51, 68 (D. Me. 2010)). Even if it did, publication of the BDN article and Fazeli's termination are not the only goal posts here for assessing temporal proximity. Fazeli also alleges that Defendants violated Section 1981 by interfering with the performance of the contracts before ultimately terminating them. Evidence of recurring resistance from Stafford employees that allegedly undermined Dr. Fazeli's authority establishes another basis

20

for the Section 1981 claim tied to events closer in time to the BDN article's publication.  In any event, Defendants' argument regarding temporal proximity is unavailing because a lack of temporal proximity is not a dispositive factor in weighing a Section 1981 claim.

To summarize, a *prima facie* case of actionable discrimination under Section 1981 is made by facts showing that Dr. Fazeli is a member of a protected class, Defendants' knowledge of Dr. Fazeli's race based on the BDN article reporting on his upbringing and his brother's involvement as a terrorist fighter in the Middle East, Suddy's characterization of Dr. Fazeli as "evil," and Suddy's involvement in the process that led to Fazeli's termination.  Defendants have rebutted the presumption of discrimination by producing evidence showing non-discriminatory reasons for terminating Fazeli's contracts.  Fazeli has, however, offered competent evidence that could establish pretext, namely Suddy's explanation that she called Dr. Fazeli "evil" based on a report she received about him mistreating a co-worker based on her sexual orientation that both the messenger and alleged victim denied having ever occurred. Under the *McDonnell Douglas* rubric, Defendants' request for summary judgment on the Section 1981 claim is properly denied.

## C.    Count II – Violation of Maine Whistleblowers' Protection Act

Defendants are not entitled to summary judgment on Fazeli's Maine Whistleblowers' Protection  Act ("MWPA") claim because the parties genuinely dispute a fact material to that claim: whether disagreements between Dr. Fazeli and

Stafford employees about prescribing antipsychotic medications factored into Fazeli's termination.

Under the MWPA, "[n]o employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment" in retaliation for reporting activity reasonably believed to be unlawful, unsafe, or substandard.  26 M.R.S.A. § 833(1); *see also id.* § (1)(A), (B), (E).  The Maine Human Rights Act "provides a direct cause of action for employees alleging discrimination based on [M]WPA-protected whistleblowing activity." *Fuhrmann v. Staples Office Superstore E., In*c., 2012 ME 135, ¶ 14, 58 A.3d 1083.

To make a *prima facie* case for retaliation under the MWPA, a plaintiff must show that "(1) he 'engaged in activity protected by the statute, (2) [he] was the subject of adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action.'" *Johnson v. York Hosp.*, 2019 ME 176, ¶ 23, 222 A.3d 624 (alteration in original) (quoting *Sullivan v. St. Joseph's Rehab. and Residence*, 2016 ME at 107, ¶ 14, 143 A.3d 1283).  But not just any causal link will suffice.  Rather, the record must show that "the alleged retaliation was a substantial, even though perhaps not the only, factor motivating the adverse employment action." *Id.* (quoting *Brady v. Cumberland Cnty.*, 2015 ME 143, ¶ 16, 126 A.3d 1145).

Defendants primarily argue that Fazeli has failed to adduce evidence showing a causal link between Dr. Fazeli's allegedly protected activity and the contract

terminations.  Defendants also question whether the MWPA protects what Fazeli contends are "protected activities,"[9] arguing that those activities do not address safety issues but rather reflect disputes with his employer about whether the employer's policy decisions create safety issues.   Fazeli rejects Defendants' characterization and contends that the Stafford employees responsible for the activities that Dr. Fazeli reasonably believed were dangerous, unlawful, or substandard harbored a retaliatory animus that infected the decision to terminate the contracts.

The parties do not dispute that Dr. Fazeli was the subject of an adverse employment action, so the crux of this claim lies in whether Dr. Fazeli engaged in MWPA-protected activity and, if so, whether the alleged retaliation in response to that activity factored substantially in Defendants' termination decision.  Viewed in the light most favorable to Fazeli, the record supports finding that at least one report—on disagreements between Dr. Fazeli and Stafford employees about resident access to antipsychotic medications—is a protected activity under the MWPA.  Dr. Fazeli was contractually obligated to "[p]romot[e] Antipsychotic reductions."  ECF No. 98 at 71, ¶ 74.  This contractual obligation supports a finding that his report regarding practices which, he claimed, were contrary to reducing the use of antipsychotic medications was made in good faith.  His contractual responsibility to

---

[9]  Defendants structure their argument for summary judgment on Fazeli's MWPA claim around the "five separate protected activities" that Fazeli listed in "response to Defendants' Interrogatory No. 15." ECF No. 79-1 at 11.  Neither Defendants' Interrogatory No. 15 nor Fazeli's response thereto are part of the Stipulated Summary Judgment Record or documents produced in discovery, though the Second Amended Complaint includes categories of protected activity that roughly correspond with Defendants' categories of the same in their summary judgment motion.

promote reductions in the use of antipsychotic medications, agreed to by the Original Facilities, also supports a finding that Dr. Fazeli was qualified to reasonably assess the health and safety implications of regulating resident access to antipsychotic medications. *See* 26 M.R.S.A. § 833(B).

As to causation, the parties genuinely dispute whether disagreements between Dr. Fazeli and Stafford employees about antipsychotic medications factored into Fazeli's termination. The parties offer record evidence to support their conflicting views. Defendants assert that their "concerns [underlying the termination decision] arose not from any insistence that [Dr.] Fazeli prescribe a drug he disagreed with, but from his failure to engage with families and nursing staff's real concerns regarding specific patient behaviors." ECF No. 98 at 14, ¶ 36 (citing emails from Feick and Doyer to Suddy). Fazeli denies that assertion and responds that disagreements over antipsychotic medications played into the decision to terminate him, citing Suddy's deposition testimony in support.

Because a jury could reasonably find that the MWPA protects Dr. Fazeli's report about alleged efforts by Stafford employees to skirt his orders on antipsychotic medications, the parties' dispute about whether any retaliatory animus arising from that report influenced the decision to terminate Fazeli is material. That genuine issue of material fact stands in the way of Fazeli meeting his burden on the MWPA claim, *see Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 23 (1st Cir. 2015), and creates a trialworthy issue for a jury to settle, *see Paul v. Murphy*, 948 F.3d 42, 49 (1st Cir. 2020), thus precluding summary judgment for Defendants.

**D.    Tort Claims**

In light of the Order on Defendants' Motion to Dismiss and Fazeli's Motion for Leave to Amend (ECF No. 28), I focus exclusively on the merits of Fazeli's tort claims arising from a Stafford employee's communications with Elizabeth Saunders, the daughter of an Avita of Stroudwater resident.   Because I previously dismissed Fazeli's tort claims to the extent that they implicate Feick, she is entitled to summary judgment on those claims.

**1.    Count III – Defamation**

Defendants are entitled to summary judgment on Fazeli's defamation claim. Although "a defamatory communication may be actionable without special harm if the defamatory communication would adversely affect the plaintiff in her business or profession," *Waugh v. Genesis Healthcare LLC*, 2019 ME 179, ¶ 11, 222 A.3d 1063, Fazeli still has the burden of making a threshold showing that the contested statement is, in fact, defamatory, *see Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 504 F.3d 189, 197-98 (1st Cir. 2007), *as amended* (Nov. 30, 2007) ("To prove defamation under Maine law, a plaintiff must establish that the defendant made a false statement that 'lower[ed] [her] in the estimation of the community.'" (alteration in original) (quoting *Ballard v. Wagner*, 2005 ME 86, ¶ 10, 877 A.2d 1083)). Put differently, proof that a negative commercial consequence flows from a statement does not, alone, make a statement defamatory.   Because Fazeli has not shown that a Stafford employee's alleged remark to Saunders was defamatory for any reason other than that it misrepresented the availability of Dr. Fazeli's services, Defendants are entitled to judgment as a matter of law on this claim.

## 2.    Count IV – Tortious Interference

Fazeli's tortious interference claim survives summary judgment as to the Defendant Entities but not the Individual Defendants because a jury could reasonably find that a Stafford employee fraudulently interfered with Fazeli's contract with Saunders' mother.

To prove a claim for tortious interference with a contractual relationship, a plaintiff must prove: "(1) the existence of a valid contract or prospective economic advantage; (2) interference by the defendant with the contract or advantage by means of fraud or intimidation; and (3) resulting damages." *Allstate Ins. Co. v. Chretien*, No. 1:12-CV-38-DBH, 2013 WL 6531751, at *12 (D. Me. Dec. 12, 2013) (citing *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 31, 915 A.2d 400). Interference by fraud requires its own showing. A plaintiff must prove that: (1) the defendants made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of the truth (4) to induce another to rely on it and (5) that the other person justifiably relied on it. *See Rutland v. Mullen*, 2002 ME 98, ¶ 14, 798 A.2d 1104.

The only genuinely disputed element of the tortious interference claim is whether a Stafford employee told Saunders that Dr. Fazeli would not be available to provide on-site care to residents after his termination with the requisite mental state to constitute interference by fraud. According to Freeman, the Executive Director at Stroudwater Lodge, all administrators at the Original Facilities were advised to tell residents and their families that "Dr. Fazeli and his practice would continue coming to the facilit[ies] for those that wanted to keep him." ECF No. 98 at 164, ¶ 452.

26

Defendants acknowledge that, "[d]espite Fazeli's role as medical director, residents of these facilities retained free choice of their medical providers."  ECF No. 98 at 3, ¶ 9.  Viewed in the light most favorable to Fazeli, it is reasonable to infer that Stafford employees at all Original Facilities knew or reasonably should have known that Dr. Fazeli would continue to be able to meet with their patients at those facilities after his contract was terminated.

That view could also support a finding that it is more likely than not that a Stafford employee—either DeMatteo or "Wendy the LPN"—made the allegedly tortious statement to Saunders.  It is reasonable to infer from Saunders' affidavit that Wendy the LPN was a Stafford employee.  It stands to reason from that inference and evidence of DeMatteo's status as a Stafford employee that *some* Stafford employee made the statement underlying Fazeli's tortious interference claim.  However, the inference also precludes a jury from reasonably finding it more likely than not that DeMatteo was, in fact, a liable tortfeasor.  On this record, whether DeMatteo or "Wendy the LPN" misinformed Saunders is a coin toss—and does not support a finding by the required preponderance-of-evidence standard that DeMatteo made the allegedly tortious statement.  Accordingly, DeMatteo is entitled to summary judgment in her individual capacity.  Further, because Fazeli's tortious interference claim is limited to facts related to a Stafford employee's alleged communications with Saunders, summary judgment is also warranted for Feick, who has not been shown to have been involved in the exchange.

## VI. CONCLUSION

For the foregoing reasons, Fazeli's Motion for Partial Summary Judgment (ECF No. 87) is **DENIED**.  Defendants' Motion for Summary Judgment (ECF No. 79) is **GRANTED IN PART** as to Defendants Feick and DeMatteo on all Counts and to the Defendant Entities on Count III.  Defendants' Motion for Summary Judgment is **DENIED IN PART** as to the Defendant Entities on Counts I, II, and IV.

**SO ORDERED.**

**Dated this the 30th day of September, 2023.**

_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**